

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-2-2001

# United States v. Pressler

Precedential or Non-Precedential:

Docket 00-1824

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Pressler" (2001). *2001 Decisions.* Paper 144.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/144

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 2, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-1824 and 00-2588

UNITED STATES OF AMERICA

v.

DANIEL E. PRESSLER, Appellant in No. 00-1824

UNITED STATES OF AMERICA

v.

SCOTT SHREFFLER, Appellant in No. 00-2588

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Crim. No. 99-cr-00133-7 and 00133-8)
District Judge: Honorable William W. Caldwell

Argued: March 8, 2001

Before: BECKER, Chief Judge, McKEE and
STAPLETON, Circuit Judges.

(Filed July 2, 2001)

        JERRY A. PHILPOTT, ESQUIRE
         (ARGUED)
        P.O. Box 116, 227 No. High St.
        Duncannon, PA 17020

        Counsel for Appellant
        Daniel Pressler

ANDREW J. OSTROWSKI, ESQUIRE
  (ARGUED)
2080 Linglestown Road, Suite 201
Harrisburg, PA 17110

Counsel for Appellant
Scott Shreffler

DAVID M. BARASCH, ESQUIRE
United States Attorney
THEODORE B. SMITH, III (ARGUED)
Assistant United States Attorney
228 Walnut Street
Harrisburg, PA 17108

Counsel for Appellee
United States of America

OPINION OF THE COURT

BECKER, Chief Judge.

A jury in the District Court for the Middle District of
Pennsylvania convicted Daniel Pressler and Scott Shreffler
of conspiracy to distribute heroin. While Pressler appeals
only his sentence, Shreffler challenges both his conviction
and sentence. Shreffler's appeal requires us to analyze the
quality and quantity of evidence necessary to establish a
conspiracy among individuals engaged in drug activity who
are loosely associated.

Shreffler submits that the evidence was insufficient to
convict him of conspiring to distribute heroin. To make out
a conspiracy charge, the Government must show: (1) a
unity of purpose between the alleged conspirators; (2) an
intent to achieve a common goal; and (3) an agreement to
work together toward that goal. The final factor--an
agreement between the defendant and some other person--
is the essence of the offense, and there is no lesser
standard for proving an agreement in drug cases. Although
this and other courts have spoken of "factors" that tend to
show the existence of a conspiracy, it is more accurate to
say that the presence of certain facts often provides

circumstantial evidence of the underlying agreement that is itself necessary to make out a conspiracy case.

The evidence here showed that Shreffler obtained and distributed a large amount of heroin. The Government demonstrated that the main person from whom Shreffler obtained his heroin, Pedro "Pete" Caban, also distributed the drug to many others, and that some of the people to whom Caban sold heroin had been referred to him by Shreffler. The evidence also established that many of the people to whom Shreffler and Caban provided heroin sold the drug themselves, including a man with whom Shreffler lived for several months. And the Government proved that Shreffler was aware of all of the above facts. But there was simply no evidence that Shreffler ever agreed to work with either his seller or his buyers to achieve a common goal or advance a common interest.

The Government contends that the evidence here was sufficient to establish a conspiracy under this Court's holding in United States v. Gibbs, 190 F.3d 188 (3d Cir. 1999). What this contention misses is that in Gibbs there was no dispute that a drug conspiracy existed--the only issue was whether the defendant had joined it. Here, in contrast, the question is whether a conspiracy existed at all. As a result, much of the discussion in Gibbs is simply inapposite. Because the Government never established the existence of an agreement between Shreffler and someone else, we will vacate his conviction on the grounds that the evidence was insufficient to support it. We will, however, affirm the judgment of sentence as to Pressler.

I.

Situated in rural Mifflin County in central Pennsylvania, Lewistown is home to less than 30,000 inhabitants. In the latter half of the 1990s, public officials noticed a disturbing rise in heroin use among students enrolled in the Lewistown school system. Local police deemed the problem so severe that they requested federal assistance. Federal investigators determined that the heroin was coming from Philadelphia, and that it was being imported by Lewistown residents who would drive to Philadelphia to purchase heroin and then return to Lewistown to use and sell it.

3

On May 26, 1999, a grand jury indicted Pressler, Shreffler, and seven others for conspiring to violate the federal drug laws in violation of 21 U.S.C. S 846. Section (b) of Count One of the indictment charged the defendants with conspiring to "[i]llegally possess with intent to distribute and illegally distribute, in violation of 21 U.S.C. S 841(a)(1), HEROIN, a Schedule I contr olled substance while over the age of 18 years to individuals under the age of 21 years, in violation of 21 U.S.C. S 859(a)."

Although their co-defendants pled guilty, Pr essler and Shreffler exercised their rights to a jury trial. The jury heard testimony from four of Pressler's and Shreffler's former co-defendants, as well as eight other witnesses. We provide the details of this testimony, infra at Part II(B), in the context of discussing Shreffler's claim that the evidence was insufficient to support his conviction. The court instructed the jury that they were to decide whether the defendants had "engaged in a conspiracy to distribute heroin," but, consistent with prevailing law at the time, did not ask the jury to determine the quantity of heroin that the defendants had conspired to distribute. The jury found Pressler and Shreffler guilty, and, via a special verdict form, also found that "the Government ha[d] proven beyond a reasonable doubt that [Pressler and Shr effler], being 18 years or older, conspired to distribute heroin to persons under 21 years old."

The Probation Officer prepared Pr esentence Investigation Reports (PSIs) for both Pressler and Shr effler. Pressler lodged two objections, one of which is relevant here. In P 14 of Pressler's PSI, the Probation Officer relayed the contents of a statement in which Craig Bedleyon told investigators that he had been hospitalized after overdosing on heroin obtained from Pressler. The Pr obation Officer relied on Bedleyon's statement in determining that Pr essler was eligible for an enhanced Offense Level of 38 pursuant to U.S.S.G. S 2D1.1(a)(2), which applies "if the defendant is convicted under 21 U.S.C. S 841(b)(1)(A), (b)(1)(B), or (b)(1)(C) . . . and the offense of conviction establishes that death or serious bodily injury resulted fr om the use of the substance." Pressler objected, claiming that his sentence could not be enhanced based on Bedleyon's over dose

4

because it had not been charged in the indictment and proved beyond a reasonable doubt.

The District Court held sentencing hearings for Pr essler on May 16 and June 2, 2000. At the close of the hearings, the court found that the Government had pr oved beyond a reasonable doubt that Pressler provided the heroin upon which Bedleyon had overdosed, and opined that such findings were the province of the court rather than the jury. The court therefore determined that Pressler was eligible for the death or serious bodily injury enhancement, which set his base Offense Level at 38. Other enhancements raised Pressler's Offense Level to 43, and his Criminal History Category was determined to be IV. This combination ordinarily would have resulted in a mandatory life sentence, see U.S.S.G. Ch. 5 Pt. A, but the District Court decided to depart downward, noting that it found Pr essler to be "less culpable" than Shreffler. Stating that it had "a duty to avoid unwarranted sentencing disparities" and characterizing Pressler's case as "present[ing] a circumstance outside of the heartland," the District Court sentenced Pr essler to serve 336 months in prison.

The District Court held sentencing hearings concer ning Shreffler on June 16 and July 14, 2000, and made extensive factual findings on August 9, 2000. Employing a preponderance of the evidence standard, the court found that Shreffler had provided heroin to both Joseph Stoner and Scott Knouse, that Stoner and Knouse had over dosed on heroin provided by Shreffler , and that each had suffered serious bodily injury as a result. The court also determined that Shreffler had distributed between 69 and 113 grams of heroin. In response to these findings, the Probation Officer revised Shreffler's PSI and concluded that he was eligible for an enhanced Offense Level of 38 pursuant to U.S.S.G. S 2D1.1(a)(2). Two other enhancements gave Shr effler an Offense Level of 42, and this, in conjunction with a Criminal History Category of V, left Shr effler with a sentencing range of 360 months to life. See U.S.S.G. Ch. 5 Pt. A. On August 23, 2000, the District Court sentenced

5

Shreffler to 360 months imprisonment. Both Shreffler and Pressler filed timely appeals.1

II.

Shreffler's primary claim is that the evidence was insufficient to convict him of conspiring to distribute heroin. In so arguing, he takes up "a very heavy burden." United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995). The Government needed to show only that Shr effler conspired with "someone--anyone." United States v. Obialo, 23 F.3d 69, 73 (3d Cir. 1994). Mor eover, because Shreffler is appealing from a jury verdict against him, "[w]e must view the evidence in the light most favorable to the government and must sustain [the] jury's verdict if `a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the gover nment proved all the elements of the offense.' " United States v. Rosario, 118 F.3d 160, 163 (3d Cir. 1997) (quoting United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir . 1991)). The elements of a charge of conspiracy are: (1) "a unity of purpose between the alleged conspirators;" (2) "an intent to achieve a common goal;" and (3) "an agreement to work together toward that goal." United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999).

A.

A perpetual problem plagues the law of conspiracy: There is no conspiracy unless the defendant agrees to work with someone else, but rarely is there dir ect evidence of a qualifying agreement. Consequently, the of fense is usually provable only through circumstantial evidence. Many courts (including this one) have spoken often of"factors" that tend to show the existence of a conspiracy. These "factors" are not direct proof that a conspiracy exists; rather, their presence serves as cir cumstantial evidence of the underlying agreement that is itself necessary to sustain

_____

1. The District Court had jurisdiction under 18 U.S.C. S 3231. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742(a).

6

a conspiracy charge. See United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986) (stating that the existence of a conspiracy "can be `inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding' " (quoting United States v. Ellis, 595 F .3d 154, 160 (3d Cir. 1979))).

The challenge we have described is especially acute when it comes to drug conspiracies, which have comprised a large portion of the criminal dockets of federal courts in recent years. In the typical drug conspiracy, there is a primary dealer who will often have a high-level confederate or, at least, one or more mid-level confederates. The primary dealer will sell drugs personally and/or through these confederates. These transactions may consist of small or moderately sized sales to end users, or of large sales to individuals who then resell the drugs to those not under the direct or indirect control of the primary dealer. Accordingly, in many drug cases, the principal question is whether the people who buy drugs from the primary dealer or from his or her confederates have joined the underlying conspiracy.

B.

There is no question that Shreffler distributed a sizeable amount of heroin. Evidence at trial established at least nineteen named people to whom Shreffler provided the drug, most of them on numerous occasions and several of them more than 30 times. Most of Shreffler's buyers were young--in fact, he sold drugs to several people who were sixteen years old or younger. Shreffler distributed heroin while at private homes, on public streets, and in public parks. He often insisted that people to whom he provided heroin consume it in front of him, so as to obviate the possibility that they might turn the drugs over to the police. Shreffler personally introduced multiple people to heroin, taught at least two people how to inject themselves, and at least twice provided heroin to people immediately after they had been discharged from drug rehabilitation programs.

7

Shreffler obtained his heroin in Philadelphia. Numerous people accompanied him to buy heroin, and Shreffler made the trip in cars belonging to at least three different individuals.2 In Philadelphia, Shreffler would sometimes buy heroin from street dealers, though he would most often buy from Pedro "Pete" Caban. Caban sold heroin out of his house, and Government witnesses testified that they observed Caban sell to a large number of people. Shreffler bragged to brothers Anthony and Aaron Forshey (who both accompanied Shreffler to Philadelphia to buy heroin on several occasions) that he had "got[ten] Pete off the street" by purchasing so much heroin from him. Shreffler told Aaron Forshey that Caban provided "a safe way to buy heroin," because buying heroin from Caban at his house obviated the need to purchase heroin from street dealers. Caban sold heroin in prepackaged bundles that were sometimes stamped with the words "Banshee," "Competition," and "Grenades."

Most of the people to whom Shreffler distributed heroin had other sources of supply (this source was often Pressler), and many of them distributed the drug as well. Many of the individuals with whom Shreffler traveled to Philadelphia to buy heroin also went without him, and some of them purchased heroin from Pedro Caban on those trips.

Numerous witnesses testified that her oin (including that sold by Caban and Shreffler) is packaged in a standardized form and is distributed for a set price. Individual doses are contained in plastic "bags," and between 8 and 13 "bags"

_____

2. At oral argument, the Government contended that Shreffler gave people heroin in exchange for driving him to Philadelphia, and specifically referenced the testimony of James Walker. Walker testified that he had driven Shreffler to Philadelphia on 5 or 6 occasions, and stated that Pressler had given him heroin in exchange for a ride to Philadelphia, but never said the same thing about Shreffler. Though we must make all reasonable inferences in favor of the Government, "[t]he law . . . requires that `the infer ences drawn . . . have a logical and convincing connection to the facts established.' " United States v. Applewaite, 195 F.3d 679, 684 (3d Cir . 1999) (quoting United States v. Casper, 956 F.2d 416, 422 (3d Cir . 1992)). We may not "infer" the existence of evidence that was simply never pr offered.

are placed in a larger plastic bag to create a "bundle." During the relevant time period, heroin sold for $10 per bag in Philadelphia and for $20 per bag in Lewistown, though a few witnesses testified that they were sometimes given volume discounts. Many of the Government's witnesses described seeing Shreffler in possession of multiple bundles of heroin.

C.

We turn to the question whether the evidence was sufficient to convict Shreffler for conspiracy to violate the federal drug laws. Though Shreffler bought a large amount of heroin from Caban, and sold her oin to a large number of people, " `a conspiracy requir es an agreement to commit some other crime beyond the crime constituted by the agreement itself.' " United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) (quoting United States v. Kozinski, 16 F.3d 795, 808 (7th Cir. 1994)). In Shr effler's view, the evidence here simply does not show such an agr eement.

1.

In both its Opening and Supplemental Briefs, the Government assumes that this case is gover ned by United States v. Gibbs, 190 F.3d 188 (3d Cir . 1999), and asserts that Gibbs mandates that we uphold Shr effler's conviction. The Government's argument, however , misses a critical distinction between this case and Gibbs. In Gibbs there was no question that a cocaine distribution ring headed by Terrence Gibbs and Darryl Coleman existed; the dispute was whether Antjuan Sydnor (who had purchased large amounts of heroin from Gibbs) had agr eed to join the conspiracy. See id. at 195, 200. Her e, in contrast, the question is whether there was a conspiracy between any of these individuals at all. We do not suggest that the Government's burden of proof is higher where the existence of an underlying group is contested. Instead, we emphasize that certain types of circumstantial evidence become substantially more probative if it can be established that a conspiracy existed and the only remaining question is whether the defendant was a part of it.

9

To see why, imagine a situation where the defendant is a street-level drug dealer. If it is shown that an organized gang controls drug distribution in the defendant's neighborhood and that the gang has divided the neighborhood into zones in which only a single dealer may operate, then the fact that the defendant consistently sells his or her drugs only with certain geographical parameters would provide evidence that the defendant both knew of the existence of the conspiracy and was a participant in it. But were there no evidence of a larger conspiracy to control drug distribution, then the fact that the defendant did all of his or her sales in a given area would be essentially irrelevant to the question whether the defendant was the member of a conspiracy.3

As a result, much of the language from Gibbs upon which the Government relies is inapposite. For example, Gibbs acknowledged that " `even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation.' " Id.  at 198 (quoting United States v. Price, 13 F.3d 711, 728 (3d Cir. 1994) and citing United States v. Theodoropoulos, 866 F.2d 587, 594 (3d Cir. 1989)) (emphasis added). Such a precept can per form analytic work if it is clear that a drug conspiracy existed and the only question is whether the defendant was a part of it, but it is singularly unhelpful where the question is whether a

_____

3. Illustrative of this point is United States v. Price, 13 F.3d 711 (3d Cir.
1994), where the evidence established the existence of a criminal organization known as the Junior Black Mafia ("JBM"). See id. at 716. As relevant here, defendant Anthony Long contended that the evidence was insufficient to convict him of conspiring to distribute cocaine and heroin,
arguing that it showed only that he was an"independent drug dealer who associated with members of the JBM." Id.  at 731. In explaining why we disagreed, we noted, inter alia, that Long had two significant social events (a wedding and a funeral) "at which many, although not necessarily all, JBM members gathered." Id. Standing alone, that Long attended a given wedding or funeral would do nothing to show that he was a member of a criminal conspiracy. But once it was shown that the funeral and the wedding were significant social events for the members of the JBM, the fact that Long was present on those occasions provided circumstantial evidence that he was a member of that organization.

"larger operation" was present at all. Because here there was no independent evidence of an overarching conspiracy, that Shreffler knew that his seller sold drugs to other people or that some of his buyers did likewise pr ovides scant support for the proposition that any of these individuals agreed to cooperate with one another.

This basic difference also explains why one of the factors about which we spoke in Gibbs does not translate well to the situation at bar. Gibbs stated that "the length of affiliation between the defendant and the conspiracy" was relevant to determining whether the defendant agreed to join it. Id. at 199 (emphasis added). W e explained that this factor is relevant because "when a defendant drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he [or she] is dealing, is more likely to depend heavily on the conspiracy as the sole source of his [or her] drugs, and is mor e likely to perform drug-related acts for conspiracy members in an effort to maintain his [or her] connection to them." Id. at 199. This factor (and our explanation for it) assumes the existence of an underlying conspiracy; after all, it makes little sense to talk about the defendant's comprehension of the nature of the "group" with whom he or she is dealing unless it has already been shown that there is an underlying group. The lack of an underlying (or overarching) conspiracy is the Government's problem here.

Lastly, and contrary to our admonitions, the Gover nment seeks to use one of the Gibbs factors as dir ect (and, indeed, dispositive) evidence of the existence of a conspiracy, rather than as circumstantial evidence of the underlying agreement necessary to create a conspiracy in the first place. The Government claims that many of Shr effler's buyers "were not simple purchasers of drugs from Shreffler; they knew that Shreffler obtained his her oin from `Pete' because [they] accompanied Shreffler on[trips to] purchase [ heroin] from `Pete' in Philadelphia on more than one occasion, and they knew about one another and about Shreffler's distribution to other persons. Under the holding of Gibbs then, they were conspirators with Shreffler in the distribution of heroin . . . and he was a conspirator with each of them."

11

In upholding the conviction in Gibbs, we str essed that Sydnor (the buyer) had been aware that Gibbs (the seller, who was unquestionably a member of a drug conspiracy) sold drugs to people other than himself, and emphasized that Gibbs had known that Sydnor resold drugs that he bought from Gibbs to other people. See id. at 201. That Sydnor knew that Gibbs sold drugs to many other people was circumstantial evidence that Sydnor knew that Gibbs was part of a larger distribution ring, and the fact that Gibbs was aware that Sydnor resold the drugs that he got from Gibbs was circumstantial evidence that Sydnor was a part of that ring. See id. at 201. But the mere fact that a defendant comprehends that a person from whom he or she buys drugs or to whom he or she sells drugs also sells drugs to others is not itself sufficient pr oof that the defendant and the other person are conspirators. Except for those who grow, harvest, or process contr olled substances themselves, all users and dealers get their drugs fr om someone else. Importantly, in Gibbs we did not hold that such evidence standing alone proved that Sydnor had joined the Gibbs/Coleman conspiracy; instead, we pointed to numerous other significant pieces of evidence, which we set forth in the margin,[4] that bore upon that question, and ultimately held that all of the "evidence [was] sufficient to support the conclusion that Sydnor intended to join the [Gibbs/Coleman] conspiracy and shared the conspiracy's goal of distributing cocaine for profit." Id. at 202–03. The fact that several of Shreffler's buyers knew that Shreffler often got his drugs from Caban and that they knew about each other is not enough to establish an agr eement among them to distribute heroin. Having established that Gibbs is not dispositive here, we now turn to the Government's arguments as to why the evidence was sufficient to support

_____

4. The Government had surreptitiously recorded telephone conversations between Sydnor, Gibbs, and another man. They revealed that: (1) Gibbs had converted powder cocaine into crack for Sydnor; (2) Sydnor had purchased a large amount of drugs fr om Gibbs; (3) Sydnor had offered to provide physical protection for Gibbs; (4) Sydnor had solicited advice from Gibbs about the commercial aspects of the drug trade.; (5) Gibbs had sold Sydnor drugs on credit; and (6) Sydnor and Gibbs had conducted their business in code. See Gibbs, 190 F.3d at 200–02.

12

the conclusion that Shreffler conspir ed with particular individuals.

2.

We begin with Caban and the Forsheys, all of whom were named in the indictment. Both Aaron and Anthony Forshey traveled with Shreffler to Philadelphia numer ous times to acquire heroin, but both also often went without him. The Forsheys originally purchased heroin fr om street dealers, but Shreffler eventually introduced them to Caban, explaining that Caban offered a "safer" way to purchase the drug. Shreffler bragged to the Forsheys that his purchases from Caban were so sizeable that they wer e responsible for "taking [Pete] off the street" and allowing Caban to sell heroin directly out of his house.

This evidence, says the Government, "was sufficient, at the very least, to establish an agreement between Shreffler and `Pete' to distribute heroin to the Forsheys." We disagree. Had Shreffler promised to steer business Caban's way in exchange for a discount on his own pur chases or for a share of Caban's profits, the two would unquestionably have qualified as co-conspirators. Unfortunately for the Government, however, there was simply no evidence of such an agreement. Instead, all that the evidence showed was that Shreffler introduced the Forsheys to another, superior source of supply from which Shr effler himself had purchased a large amount of heroin.

What was lacking here can be illustrated by use of analogy. Imagine the owners of two convenience stor es, X and Y. Both originally obtain soda for r esale from various, unaffiliated wholesalers, but X discovers that wholesaler Z is easier to deal with. X then begins to buy all of her soda from Z (a sizeable amount) and infor ms Y that Z provides a superior source of supply. Y then begins to purchase a great deal of soda from Z as well. Just as this evidence, standing alone, would be insufficient to pr ove an agreement between X and Z to distribute soda to Y, the evidence in this case was not enough to support a conclusion that Shreffler and Caban conspired to distribute heroin to the Forsheys. It is common for people to tell their friends about

13

a good store or restaurant. Though the Government proved that Shreffler was a very good customer to Caban, that he had recommended Caban to others, and that Caban benefitted from Shreffler's patr onage, it did not show that Shreffler and Caban ever agreed to work together on anything.

Likewise, we conclude that there was insufficient evidence to support a finding that Shreffler conspired with the Forsheys. The Government notes that "the evidence at trial established that the heroin [that Shr effler and the Forsheys] obtained from `Pete' was not solely for their own use but was sold and otherwise distributed by them to others." "Thus," submits the Government, "the Forsheys admitted that they conspired with `Pete' and with Shreffler to distribute heroin." The Government reads too much into this evidence--the fact that the Forsheys and Shr effler knew that they were involved in the same "business" (in this case, the distribution of heroin) and that they obtained much of their supply from the same "distributor" (Caban) simply does not establish that they agreed to pool their "efforts." We therefor e hold that there was insufficient evidence to support a jury finding that Shr effler conspired with Pedro Caban, Aaron Forshey, or Anthony Forshey.5

3.

Although he was not named in the indictment, the Government's conspiracy case was strongest with respect to Charles "Chuckie" Stoner. Stoner and Shreffler traveled to Philadelphia together to purchase heroin on several occasions, although each also frequently went without the other. Shreffler was one of the people who introduced Stoner to Caban, and the latter later became a major source of supply for the former. Shreffler essentially lived with Stoner for "four or five months." During that time, both Shreffler and Stoner sold heroin out of Stoner's home,

_____

5. The Government's Brief also summarily alleges that James Walker was a co-conspirator of Shreffler, but elaborates only that Walker bought heroin from both Shreffler and Charles Stoner. In the absence of stronger evidence than this, we conclude that the evidence was insufficient to support a conclusion that Shreffler conspired with Walker.

14

people would call "seven or eight" times a day about purchasing heroin. Stoner obtained some of his heroin from Shreffler, and would sometimes sell heroin to those who came to his house looking for Shreffler when the latter was not present.

This case is somewhat similar to United States v. Powell, 113 F.3d 464 (3d Cir. 1994), wher e we found the evidence sufficient to support a jury's finding that James Powell had conspired with his brother Antonio Powell to distribute cocaine. In that case:

> A witness testified that James and Antonio Powell lived together, that they both sold cocaine, that they shared plastic bags to package the cocaine, and that if one of the brothers ran out of cocaine to sell, the other brother would supply it. As noted, James Powell assured a police informant that the cocaine the Powell brothers would sell the next day would match in quality the cocaine sold earlier by Antonio Powell. During a recorded telephone conversation, Antonio Powell consulted James Powell before setting the sales price for cocaine[, and James Powell also served as a lookout and driver when Antonio Powell sold cocaine to an undercover agent].

Id. at 467.

The relationship between Shreffler and Stoner bears some resemblance to that between the Powell br others. Like the Powells, Shreffler and Stoner lived together for several months, and both of them sold drugs out of their shared residence on a daily basis. And there was evidence that Stoner would sometimes supply drugs to customers when Shreffler was not available to do so. But, standing alone, all that this evidence proved was that Shreffler and Stoner were drug dealers who lived together for a time; it would not, in our view, be enough to show the existence of an agreement between them.

Moreoever, in Powell ther e was a great deal of evidence that the brothers had pooled their efforts, but none of the types of evidence that existed in that case ar e present here. First, as noted above, James Powell acted as a lookout when Antonio Powell conducted drug sales, and that fact

15

alone may well have been enough to show the existence of a conspiracy between the brothers. When one person serves as a lookout during another person's drug deals, it suggests a unity of purpose and an intent to achieve a common goal (to sell drugs without being caught) and an agreement to work together toward that goal (because one does not serve as a lookout without agreeing to do so). In this case, however, there was no testimony that Shreffler or Stoner ever served as a lookout for the other.

Second, the fact that the Powell brothers consulted each other before setting a sales price for a given deal strongly implied that they had agreed to coordinate their activities. Here, in contrast, there was no evidence of such conversations between Shreffler and Stoner. Lastly, the fact that the Powell brothers shared packaging materials demonstrated that they had integrated their activities, which implied the presence of an underlying agreement. There was no such evidence here.

Also lacking here are the sort of facts that we found sufficient to support the conviction in Gibbs. In Gibbs, there was evidence that Sydnor (the buyer) had offered to provide physical protection for Gibbs (the seller). See 190 F.3d at 200--01. That Sydnor was willing to stick his neck out for Gibbs suggested that he had a greater stake in the latter's safety than a typical buyer, which in turn implied that a cooperative relationship existed between the two of them. See id. at 201. There was also evidence that Gibbs had sold Sydnor drugs on credit, which meant that each had an economic stake in the other's continued success. See id. Lastly, Gibbs and Sydnor conducted their business in code, which demonstrated a considerable degree of coordination and suggested the presence of a cooperative relationship. See id. at 200-02. The Shreffler/Stoner relationship had none of these hallmarks.

The only direct evidence of an agreement between Shreffler and Stoner was a single sentence in James Walker's testimony. Walker stated that Stoner "would sell for Scott when Scott wasn't around." Although the question is quite close in light of the jury's verdict and our resultant standard of review, we conclude that this evidence is not strong enough to support Shreffler's conviction.

16

Walker made the statement at issue in response to the question "Tell us how you were introduced to [Charles Stoner]." Walker's full answer reads: "I went to his house, and I bought a bag of heroin from him. He would sell for Scott when Scott wasn't around." The next question was: "How do you know he was selling for Scott Shreffler?" Walker got as far as saying "Because he told me that --" before being interrupted by an objection. The objection was first sustained, though it was eventually overruled after a colloquy between the court and counsel for both sides. At that point, the prosecutor asked Walker to "[t]ell us what was said to you by Stoner concerning the heroin." In response, Walker stated: "I went there and he was out of heroin. He said he'd have to call Scott to get some more. So he was getting it from Scott to sell." Walker's testimony then turned to a discussion of his dealings with Scott Shreffler.

What the above makes manifest is that it is unclear what Walker meant by the critical statement or the basis upon which he made it. Perhaps by "sell for Scott" Walker meant that he thought that Stoner sold heroin on behalf of Shreffler rather than in lieu of Shreffler when the latter was not around the house. But even if this is the correct reading of Walker's statement, the record contains no way to determine the basis of his belief. Walker started to address that issue, but was interrupted by an objection and the prosecutor never returned to it. The only information we have that bears on the basis for Walker's belief is his response to the next question put to him, when he said: "I went there and he was out of heroin. He said he'd have to call Scott to get some more. So he was getting it from Scott to sell." If Walker's belief that Stoner was selling "for" Shreffler was based only on the facts contained in the above-quoted answer, then that evidence would be insufficient to support a finding that there was an agreement between Shreffler and Stoner for the reasons stated above. If Walker's belief was based on something else, then there is nothing in the record to explain or justify Walker's inchoate conclusion.

We must, of course, view the evidence as a whole and in the light most favorable to the Government; moreover, we

17

must make all reasonable inferences in its favor. See United States v. Rosario, 118 F.3d 160, 163 (3d Cir. 1997). But it is also the case that, even after doing that, the question remains whether a reasonable jury couldfind that the Government had proved each and every element of the offense beyond a reasonable doubt. See id. Although the evidence here would almost certainly be enough were this a civil case and the burden of proof a mer e preponderance of the evidence, this is a criminal case and the Government had a much higher burden to surmount. Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (holding that a court considering a motion for summary judgment must take into account the standard of proof that would apply at trial, and specifically drawing an analogy to situations where courts consider motions for acquittal in criminal cases). In the absence of other evidence from which it could be inferred that Shreffler and Stoner had agreed to a common endeavor (and there is none), we hold that Walker's ambiguous and unexplicated statement is not enough to support a conclusion beyond a reasonable doubt that Shreffler and Stoner were confederates who agreed to work together as opposed to two drug dealers who shared the same house for a time.

For a reason that escapes us, the Gover nment did not charge Shreffler with distribution of heroin--a crime for which the evidence at trial was more than sufficient to convict, and for which he could have received the sentence challenged here.[6] Instead, it opted to indict and try him only for conspiracy to distribute heroin. But a conspiracy conviction may stand only if the Gover nment proves the existence of an underlying agreement. Ther e is no special rule for, or lesser burden in, drug cases. To parody a familiar literary allusion, a conspiracy is a conspiracy is a conspiracy. Because the Government never demonstrated the existence of an agreement between Shr effler and at least one other person, we will set aside Shr effler's

_____

6. We express no opinion as to whether the Government may re-indict Shreffler for distribution.

18

conviction on the grounds that the evidence was
insufficient to support it.[7]

III.

Pressler advances only one argument befor e us. He
contends that his sentence was imposed in violation of

(Text continued on page 21)
_____

7. Shreffler also contends that the District Court: (1) erred in allowing
testimony about used heroin packages and syringes; (2) violated the
teachings of Apprendi v. New Jersey, 530 U.S. 466 (2000) by finding that
he had distributed heroin that resulted in two overdoses instead of
submitting the issue to the jury; and (3) err ed in determining the
amount of heroin attributable to him and in determining that he had
provided the heroin resulting in the Krouse and Stoner overdoses. In
light of our holding that there was insufficient evidence to convict
Shreffler on the underlying conspiracy char ge, we need not address
these issues.

Prompted by questioning from a member of the panel, Shreffler also
contended at oral argument that the District Court had erred in
determining that he was eligible for an enhanced Offense Level of 38
pursuant to U.S.S.G. S 2D1.1(a)(2), which applies "if the defendant is
convicted under 21 U.S.C. S 841(b)(1)(A), (b)(1)(B), or (b)(1)(C), . . .
and
the offense of conviction establishes that death or serious bodily injury
resulted from the use of the substance." The basic thrust of the
argument is that Shreffler's "of fense of conviction establishes" only
that,
being over 18 years old, he conspired to distribute heroin to persons
under 21, but it does not "establish that death or seriously bodily injury
resulted" from the heroin that Shr effler conspired to distribute. If this
submission were correct (and had we upheld the conviction), then
Shreffler would have needed to be resentenced to a substantially shorter
term of imprisonment because the highest Of fense Level for which he
could otherwise be eligible would be 32. The ef fort to determine the
proper meaning of "offense of conviction" in the context of drug cases
illustrates a potentially serious problem with regard to the drafting of
the
Guidelines in the wake of Apprendi. Although we need not decide this
claim because of our decision to vacate Shreffler's conviction, we
identify
the problem for the benefit of the Sentencing Commission and suggest
that it may wish to consider redrafting S 2D1.1(a)(2).
The Guidelines never define "offense of conviction," but several factors
lead us to believe that the phrase includes only the facts underlying the
specific criminal offense for which the defendant was convicted.
Application Note 1(l) to S 1B1.1 states that" `[o]ffense' means the
offense

of conviction and all relevant conduct under S 1B1.3 (Relevant Conduct)

19

unless a different meaning is specified or is otherwise clear from the context." (emphasis added). This formulation makes manifest that "offense of conviction" is narrower than "offense." This supposition is supported by Section 1B1.3, which states that a defendant's "Offense Conduct" is determined by examining

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and in the case of a jointly undertaken criminal activity . . . [includes] all reasonably for eseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the of fense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that of fense.

Significantly, this language suggests that not all acts or omissions committed or willfully caused by a defendant during the commission of the offense of conviction are themselves part of the offense of conviction, and seems to indicate that "offense of conviction" includes only the facts undergirding the specific offense for which the defendant was convicted, whereas "Relevant Conduct" includes other , uncharged and related activities.

Additional support for our narrower reading of "offense of conviction" comes from U.S.S.G. S 1B1.2(a) (Applicable Guideline), which instructs sentencing courts to begin by "determin[ing] the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the indictment or information of which the defendant was convicted)." (emphasis added). Also relevant is the amendment history of S 3A1.1(a) (Hate Crime Motivation of Individual Victim). In the past, that Section pr ovided for a three step Offense Level enhancement "[i]f the finder of fact . . . determines . . . that the defendant intentionally selected any victim . . . as the object of the offense because of actual or perceived race, color, religion, national origin, ethnicity, gender, disability or sexual orientation." U.S.S.G. S 3A1.1(a), historical notes, 1997 amendments, available in Westlaw (emphasis added). In 1997, however, the operative language was changed to require that the defendant select the victim "as the object of the offense of conviction." Id. (emphasis added). "Consistent with Congress' intent to punish a defendant whose primary objective in committing a hate crime was to harm a member of a particular class of individuals," the Sentencing Commission explained that the amendment was necessary to clarify "that the enhancement in subsection (a) is limited to the victim of the defendant's offense of conviction." (emphasis added).

20

Apprendi v. New Jersey, 530 U.S. 466 (2000), because it
was arrived at in part as a result of sentencing findings
made by the District Court. He is incorrect.

The jury convicted Pressler of conspiracy to distribute an
_____

This history supports our view that "offense of conviction" includes only
the substantive crime for which a particular defendant was convicted.

If we are correct, then the critical inquiry involves identifying the
substantive crime for which the defendant was convicted. But Apprendi
makes answering that question difficult in many drug cases. Before
Apprendi, the consensus view was that 21 U.S.C. S 841 contained but a
single "crime," which was codified in S 841(a). See, e.g., United States
v.
Chapple, 985 F.2d 729, 731 (3d Cir . 1993). That Section makes it illegal
to, inter alia, "knowingly or intentionally . . . manufacture, distribute,
or
dispense . . . a controlled substance." Section S 841(b) then lists an
enormous range of variables that operate to cr eate sentencing exposures
ranging from "not more than one year" to a mandatory life sentence.
Compare 21 U.S.C. S 841(b)(3) (distribution of a Schedule V controlled
substance) with id. S 841(b)(1)(C) (distribution of a Schedule I or II
controlled substance by a person who has a prior conviction for a felony
drug offense and where death or serious bodily injury results from the
use of that substance). Prior to Apprendi , it was the view of this Court
that all S 841(b) findings were for the sentencing court rather than the
jury. See, e.g., Chapple, 985 F.2d at 731. Under such a regime, it would
have been reasonable to conclude that a defendant's "offense of
conviction" included the jury's finding that the defendant had violated
S 841(a) and the sentencing court's deter mination as to which of the
S 841(b) factors were present.

Such reasoning, however, is problematic after Apprendi, whose central
teaching is that "[o]ther than the fact of a prior conviction, any fact
that
increases the penalty for a crime beyond the pr escribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable
doubt." 530 U.S. at 466. The "prescribed statutory maximum" is the
longest sentence that a defendant could receive based solely on the facts
necessarily encompassed within the jury's ver dict of guilty. See, e.g.,
United States v. Williams, 235 F.3d 858, 863–64 (3d Cir. 2000). For
example, if a jury finds a defendant guilty of"distribution of cocaine"
without making a specific finding as to quantity or any other factors,
then the "prescribed statutory maximum" is 20 years. Thus, to avoid
rendering one of the most significant federal criminal statutes
unconstitutional, many of our sister circuits have held that any fact that
increases a defendant's sentence beyond that which would have been

21

unspecified amount of heroin, specificallyfinding that he was over 18 years old and that he had conspir ed to distribute heroin to persons under the age of 21. (Pr. App. 51). Section 846 of Title 21 of the United States Code makes it unlawful to conspire to violate the federal drugs laws, and provides that those who do ar e subject to the same penalties as those who commit the underlying offenses. Absent a quantity finding, distribution of heroin generally carries a maximum sentence of 20 years in prison. See 21 U.S.C. S 841(b)(1)(C). But 21 U.S.C. S 859(a) doubles all applicable penalties for persons over the age of 18 who distribute narcotics to persons under the age of 21. Based solely on the jury's verdict, ther efore, Pressler's maximum sentence was 40 years--twelve years more than his ultimate sentence of 336 months. A defendant has no valid Apprendi claim where, as here, his ultimate sentence is less than that which would have been authorized by the jury's verdict. See United States v. W illiams, 235 F.3d 858, 863 (3d Cir. 2000); see also id. at 862 ("Apprendi does not

_____

permissible absent that fact is an "element" of the S 841 "offense." See, e.g., United States v. Westmoreland, 240 F.3d 618, 632-33 (7th Cir. 2001) (citing cases).

Though saving S 841 from unconstitutionality in many situations, this interpretation--in conjunction with the possible interpretation of "offense
of conviction" outlined previously--may have consequences not intended by the Sentencing Commission. If the statutory interpretation embraced by our sister circuits is correct, thenS 841 describes not one, but many "crimes," and the "crime" for which Shr effler was convicted was conspiracy to distribute an unspecified amount of heroin by persons over 18 to persons under 21. See 21 U.S.C. S 846; S 841(a); S 841(b)(1)(C); S 859(a). And if the interpretation of"offense of conviction" that we outlined above is right, then Shreffler's"offense of conviction" did not "establish" that "death or serious bodily injury resulted from the use of the" heroin that he conspired to distribute, and the District Court erred in finding that he was eligible for an enhanced Of fense Level pursuant to U.S.S.G. S 2D1.1(a)(2). We ar e cognizant that this potential result may
be at odds with the intent of the Sentencing Commission, which, after all, wrote the Guidelines long before Apprendi altered the background legal landscape. We therefore call this matter to the attention of the Commission and suggest that this (and possibly other Guidelines provisions) may need to be redrafted in light of Apprendi.

22

apply to . . . increase[s] . . . under the Sentencing Guidelines."). We will, therefor e, affirm Pressler's sentence.

IV.

The judgment of conviction in No. 00-2588 will be vacated, and the matter remanded to the District Court with instructions to enter a judgment of acquittal in favor of Defendant Scott Shreffler. The judgment of sentence in No. 00-1824 will be affirmed. The Clerk is directed to send this opinion to the Chair and Chief Counsel of the United States Sentencing Commission, calling their attention to footnote 7.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit