**UNITED STATES of America**

v.

**Foster J. PRICE, Jr., Appellant.**

**No. 08–4294.**

United States Court of Appeals, Third Circuit.

Argued Sept. 22, 2009.

Filed: Sept. 30, 2009.

Christopher A. Ferro, [Argued], Griest, Himes, Herrold, Schaumann, Ferro, LLP, for Appellant.

Martin C. Carlson, Theodore B. Smith, III, [Argued], Office of United States Attorney, Harrisburg, PA, John J. McCann, Office of United States Attorney, for Appellee.

Before: BARRY, FISHER and JORDAN, Circuit Judges.

OPINION OF THE COURT

JORDAN, Circuit Judge.

Foster Price, Jr. was convicted by a jury in the United States District Court for the Middle District of Pennsylvania on charges related to the possession and distribution of heroin and was sentenced to 27 years in prison. He appeals the District Court's judgment of conviction and sentence on four grounds, arguing first that there was insufficient evidence to convict him of being part of a conspiracy to distribute heroin, second, that the District Court erred in determining at sentencing that he was

responsible for the distribution of more than one kilogram of heroin, third, that the District Court erred by applying a leadership enhancement to his offense level in calculating his Guidelines range, and fourth, that the District Court erred by denying his motion for a mistrial based on comments made by the prosecutor during closing argument. For the reasons that follow, we will affirm Price's conviction and sentence.

## I. Background

On February 9, 2006, Price, who lived in central Pennsylvania and sold heroin there, was indicted on one count of conspiring to distribute and possess with intent to distribute more than a kilogram of heroin, in violation of 21 U.S.C. § 846, and three counts of distribution and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). A number of alleged co-conspirators, both indicted and unindicted, testified for the government at Price's trial. We will summarize the most pertinent testimony.

Jayme Hoagland testified that she regularly bought heroin from Price—both to feed her addiction and to sell to others—while she was a minor, both before and during the early stages of a pregnancy. She also stated that Price "cut" and "bagged" heroin in her apartment[1] and stashed "bricks"[2] of heroin above her ceiling tiles. Furthermore, Hoagland explained that, when Price's schedule changed so that he was frequently out of the area, he introduced her to a new dealer, Ali Patterson. She claimed that she often traveled to Newark, New Jersey to purchase heroin from Patterson. Hoagland's boyfriend, Casey Dodson, testified that he, too, regularly obtained heroin, for his personal use and for redistribution, from Price over a period of approximately six months. According to Dodson, he would not pay for the heroin up front, but would give Price some of the proceeds that he received from his sales.

Jeremy Robinson testified that he often purchased heroin, multiple bricks at a time, from both Price and Patterson, and admitted to reselling much of what he bought.[3] He also testified that Price and Patterson "pretty much mutually agreed that they knew each other." (Supp.App. at 282.) However, he did not indicate that Price introduced him to Patterson or recommended Patterson as an alternative source. He claimed to have met Patterson independently, when he went to Newark to "cop [heroin] off the street." (Id. at 285.)

Patterson, who pled guilty to conspiring to distribute one kilogram or more of heroin, admitted that, for approximately two years, he sold three to seven bricks of heroin per day, five days a week, on Grafton Avenue in Newark. He claimed that he did not know his customers personally; they would drive up to where he was stationed, make their purchases, and drive away. Patterson testified that he and Price grew up together and had known each other all of their lives. He denied, however, that he sold heroin to Price, that Price introduced him to customers, or that customers expressed that they had come

1. Hoagland indicated that by "cut," she meant that Price would adulterate the heroin with an inert substance, and by "bag," she meant that Price would separate the heroin into individual units for sale.

2. According to expert testimony proffered by the government, there are ten bags of heroin in a bundle and five bundles in a brick, and a brick of heroin usually weighs slightly more than a gram, although the weight can vary slightly between bricks. Price does not dispute those figures.

3. Robinson also acknowledged that he shared some of his heroin with his girlfriend at the time, Devin Gessner, but it is not clear from the record whether Gessner sold the drug.

on Price's behalf or recommendation. He testified that he still had family in the violent neighborhood where he and Price grew up, but when the prosecutor asked him whether he would fear repercussions if he gave testimony that incriminated Price, Patterson responded that he would not.

Tony Dunka testified that he was introduced to Price by Hoagland and Dodson and that he regularly purchased heroin from Price. In June 2003, Dunka was arrested by Pennsylvania State Trooper Nicholas Madigan for a drug offense. Dunka ultimately agreed to work as a confidential informant and arranged for Madigan to purchase a brick of heroin from Price on February 10, 2004, at the Susquehanna Mall in Selinsgrove, Pennsylvania. Madigan and Dunka arrived at the mall and were met there by one of Price's associates, a man that Dunka identified as "Chachi." During the meeting, Madigan purchased a brick of heroin from Chachi. Following the purchase, Dunka spoke to Price, who indicated that he was pleased with how things had gone, and set up a second meeting for February 27 at the same location. This time, Price came to meet Madigan and sold him another brick of heroin. Dunka also testified that he saw Price with eight-to-ten bricks of heroin on six or seven other occasions.

Testifying on Price's behalf, James Giardina admitted that he had purchased heroin for redistribution from Patterson and Hoagland but claimed that he had never met or even heard of Price before the instant proceedings. However, Tracy Burgos, a government witness who bought heroin from Giardina, testified that Giardina had mentioned Price's name to her and that she understood that Giardina got his heroin from Price.

The parties stipulated that if an expert witness for the government, Ann Wagner, had testified, she would have established that the bricks that Price sold to Madigan contained heroin and that they weighed 1.2 and 1.4 grams respectively. Pennsylvania State Trooper Russell Burcher testified that he estimated, based on that stipulation and witness testimony, that Price and Patterson collectively sold between 815 and 1,674 grams of heroin. That range did not include the heroin that Patterson may have sold to other individuals who are not named in this opinion.

During closing argument, the prosecutor questioned Patterson's testimony that he and Price had not conspired to sell heroin by stating that Patterson may not have wanted to testify against Price because the two were close and Patterson feared repercussions in his neighborhood. Price objected to the prosecutor's remarks and moved for a mistrial, but the District Court denied his motion. The jury found Price guilty of one count of conspiracy to distribute and possess with intent to distribute more than one kilogram of heroin (the "conspiracy count")[4] and two counts of distribution and possession with intent to distribute heroin (the "distribution counts").[5] In response to a special interrogatory, the jury also found, beyond a reasonable doubt, that one kilogram or more of heroin was distributed or intended to be distributed as part of the conspiracy.

---

**4.** The conspiracy count encompassed more than simply conspiring to possess and distribute heroin. On the Judgment of Conviction, the count is set forth as follows: "Conspiracy to Distribute and Possess With Intent to Distribute More Than 1 Kilogram of Heroin; Distribute and Possess With Intent to Distribute Heroin to Individuals Under Age 21 While Being Over Age 18; Provide and/or Distribute Heroin to a Pregnant Individual." (App. at 3.)

**5.** The jury acquitted Price of the third count of distribution and possession with intent to distribute heroin.

In its Presentence Report ("PSR"), the United States Probation Office concluded that Price was responsible for conspiring to distribute 2.393 kilograms of heroin. That figure included the heroin sold both by Price and by Patterson during the two years that Patterson admitted to selling heroin on Grafton Avenue, and, under United States Sentencing Guideline ("U.S.S.G.") § 2D1.1(c), resulted in a base offense level of 32. Pursuant to U.S.S.G. § 2D1.2(a), the Probation Office added one-level because Price sold heroin to Hoagland while she was pregnant and while she was a minor and two levels because Price possessed dangerous weapons during the commission of his offenses. It also recommended a four-level increase on the ground that Price was an organizer or leader of a criminal activity that involved five or more people.[6]

Price objected to the amount, arguing that, because he had no involvement with any of Patterson's drug sales, he was responsible for less than one kilogram of the drug. The District Court disagreed. While it did not attribute to Price all of the heroin that Patterson sold during his time as an admitted dealer, it held him responsible for the heroin that Hoagland bought from Patterson, which, when coupled with the heroin that Price sold himself, exceeded one kilogram.

Price also objected to the leadership enhancement, arguing that it was not supported by the evidence.[7] The Court agreed in part, finding that there was no evidence that Price exercised decision-making authority over the group as a whole, recruited accomplices, or claimed a larger share of the profits of the crime. The Court did find, however, that Price was a manager or supervisor, and was therefore subject to a three-level enhancement, because he supplied the group with heroin and exercised control over Chachi.

With the three-level enhancement, Price's Guidelines range was 324 months (27 years) to 405 months (33 years and nine months). After addressing Price's objections and considering the appropriate sentencing factors, the District Court sentenced Price to 27 years' imprisonment on the conspiracy count and 20 years on each of the distribution counts, all sentences to run concurrently. Price filed a timely appeal challenging both his conviction and sentence. On appeal, Price contends that there was insufficient evidence that he was involved in a conspiracy to sell heroin and that the District Court erred in concluding at sentencing that he was responsible for the sale of over a kilogram of heroin.[8] Price also argues that the Court erred by enhancing his sentence based on a finding that he was a manager or supervisor, and by denying his motion for a mistrial based on the prosecutor's argument that Patterson did not want to inculpate Price because he feared repercussions against his family and because of the culture prevalent in the housing projects where the two men grew up.

## II. Discussion[9]

### A. Sufficiency of the Evidence

■ Price argues that there was insufficient evidence to convict him of conspiracy to distribute heroin. We review the suffi-

---

6. In calculating Price's offense level, the probation office grouped the distribution counts with the conspiracy count under U.S.S.G. § 3D1.2(d).

7. He did not object to the enhancements for possession of dangerous weapons or distribution to a pregnant individual and/or a minor.

8. Price does not challenge his convictions on the distribution counts.

9. The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

ciency of the evidence in the light most favorable to the government and will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Diallo,* 575 F.3d 252, 256 (3d Cir.2009). To establish a charge of conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846, the government must show: (1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal.[10] *United States v. Pressler,* 256 F.3d 144, 147 (3d Cir.2001).

That Price was involved in a conspiracy to distribute heroin, a controlled substance, in central Pennsylvania is amply supported by the record. The government proffered evidence that, after Dunka set up a controlled buy with Price, Chachi came to the meeting place to complete the transaction. Furthermore, Hoagland testified that she distributed heroin that she bought from Price and that she allowed Price to cut, bag, and store heroin in her home. Dodson likewise testified that Price would give him heroin, some of which Dodson would sell, without requiring payment up front. Finally, Robinson testified that he bought large quantities of heroin from Price and resold much of it. While Robinson is more tenuously connected to the conspiracy than Chachi or Hoagland, who took active roles in furthering the drug sales that Price personally conducted, or Dodson, whose status as a "middle man" in the operation is supported by the fact that Price allowed him to purchase heroin on credit, a reasonable trier of fact could infer that Robinson worked with Price in the same capacity that Dodson did. Sufficient

evidence thus supports the conclusion that Price conspired with Chachi, Hoagland, and Dodson, as well as Robinson, to sell heroin.

Whether Price conspired with Patterson to the same end is a much closer question. While the government demonstrated that Price introduced at least Hoagland to Patterson, an introduction without more does not necessarily demonstrate an agreement to work towards a common goal. In *Pressler,* 256 F.3d 144, we were confronted with a similar relationship between two drug dealers: the first dealer, Scott Shreffler, introduced two of his customers to "another, superior source of supply from which Shreffler himself had purchased a large amount of heroin." *Id.* at 153. Noting that "[i]t is common for people to tell their friends about a good store or restaurant," we concluded that the referral "did not show that [the two dealers] ever agreed to work together on anything" and no evidence beyond the referral pointed to such an agreement. *Id.* at 154.

At the same time, we recognized in *Pressler* that evidence which would not be sufficient to establish a conspiracy may be sufficient to link an individual to an existing conspiracy. *Id.* at 152. Such evidence exists here. Price introduced at least one customer/dealer to Patterson, and the jury had evidence from which it could conclude that Price and Patterson had at least two overlapping clients in Hoagland and Robinson, both of whom also resold much of the heroin that they purchased. Likewise, it could conclude that Patterson's associate Giardina was also a distribution outlet for Price. A rational jury could thus decide that the overlapping distribution network

---

**10.** These elements differ from those required to prove a criminal conspiracy under 18 U.S.C. § 371. *See United States v. Rankin,* 870 F.2d 109, 113 (3d Cir.1989) ("The three elements of a Section 371 conspiracy are: 1) the existence of an agreement, 2) an overt act by one of the conspirators in furtherance of the objective, and 3) an intent on the part of the conspirators to agree....").

employed by Price and Patterson was not mere coincidence but was proof of a coordinated effort between Price and Patterson to distribute heroin in central Pennsylvania. Here, by virtue of attributing more than a kilogram of heroin to Price, the jury effectively found that Price and Patterson were co-conspirators. Viewing the evidence, as we must, in the light most favorable to the government, we agree that it is sufficient to support the jury's finding of the existence of a conspiracy, including Patterson as a co-conspirator.

## B. Quantity of Heroin

When a district court determines drug quantity for purposes of sentencing, we review its findings for clear error. *United States v. Sau Hung Yeung*, 241 F.3d 321, 322 (3d Cir.2001). The District Court in this case attributed a total of 1,136.4 grams—or 1.1364 kilograms—of heroin to Price. Specifically, based on witness testimony, it estimated that Price sold 711.6 grams of heroin collectively to Hoagland, Dodson, and Robinson, and 64.8 grams of heroin in transactions to which Dunka was privy. It further estimated that Patterson sold 360 grams of heroin to Hoagland and attributed that amount of the drug to Price.[11]

Price's lone criticism of the quantity determination is that the Court improperly included heroin sold by Patterson. However, as already described, because sufficient evidence supports Patterson's role in the conspiracy, the Court did not err in attributing to Price the heroin that Patterson sold to Hoagland. Its calculation, therefore, was proper.

## C. Leadership Enhancement

■ Price argues that, in addition to attributing too much heroin to him, the District Court erroneously applied a three-level leadership enhancement. We disagree. The now-advisory U.S.S.G. § 3B1.1 instructs sentencing courts as follows:

> Based on a defendant's role in the offense, increase the offense level as follows:
>
> (a) if the defendant was an organizer or leader of a criminal activity that involved 5 or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved 5 or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Factors that courts should consider in determining a defendant's leadership role include whether the defendant exercised decision-making authority, the nature of the offender's participation in the crimes, whether the defendant recruited others, the degree to which the defendant claimed a larger share of the proceeds of the crime, and the degree of control which the defendant exercised over the criminal activity. U.S.S.G. § 3B1.1, n. 4. (Nov.2008 ed.); *United States v. Gricco*, 277 F.3d 339, 358 (3d Cir.2002). Because a district court's assessment of a defendant's role in a criminal conspiracy is "essentially factual in nature," we review its determination on

---

11. Courts are permitted "a degree of estimation" and may make their estimates by relying on testimony regarding the average amount of drugs sold per week and multiplying by the period of time over which the drugs were sold. *United States v. Gibbs*, 190 F.3d 188, 203–204 (3d Cir.1999). Price does not dispute any of the District Court's individual quantity estimates, and each finds ample support in the record.

that issue for clear error. *United States v. Hunter,* 52 F.3d 489, 492 (3d Cir.1995).

Although the government argued, and the Probation Office suggested, that Price should be subjected to the four-level enhancement articulated in U.S.S.G. § 3B1.1(a), the District Court found that there was no evidence that Price exercised decision-making authority over the group as a whole, recruited individuals into the conspiracy, or claimed a larger share of the proceeds. Instead, it concluded that he was a manager or supervisor and applied a three-level enhancement under U.S.S.G. § 3B1.1(b). That determination is not clearly erroneous.

The three-level enhancement requires two findings: (1) that the defendant was a "manager or supervisor", and (2) that the management or supervision by the defendant was of a criminal enterprise that involved at least five people or was otherwise extensive. The government proffered uncontested evidence that Price exercised control over Chachi, whom he sent to conduct the first controlled heroin sale to Officer Madigan, and that he served as a primary supplier of heroin for other co-conspirators. Given Price's authority over Chachi and the control he exercised over the supply of heroin, the District Court did not err in labeling him a manager. Moreover, as noted above, there is sufficient evidence that Price conspired with at least five other people—Chachi, Hoagland, Dodson, Robinson, and Patterson—to distribute heroin. The "five or more participants" standard of U.S.S.G. § 3B1.1(b) is thus met.

### D. *Prosecutor's Remarks During Closing*

■ Price argues that the District Court erred in denying his motion for a mistrial, in which he contended that, during closing argument, the government made remarks that were not based on the record and prejudiced his right to a fair trial. In an attempt to discredit Patterson, who was called by the government but testified that he and Price did not conspire to sell heroin, the prosecutor stated:

> What did [Patterson] tell you about the projects? It's dangerous. There's violence there. What else did he tell you. He still has family back there. . . .
>
> He told you he's got his grandmother, his mother, his sister, his daughter[, h]is baby mother [sic] all live in the projects.
> . . .
> [Patterson is] going to admit what he did, but he's not going to testify against [Price.] He's got two reasons for it. It's part of the culture, he's not going to do it, and he's got family back there. And remember Price is from the projects also. They grew up in the same neighborhood.

(Supp.App. at 556.)

"We review a district court's decision to deny a motion of a mistrial predicated on the grounds that the prosecutor made improper remarks in a closing argument for abuse of discretion." *United States v. Wood,* 486 F.3d 781, 786 (3d Cir.2007) (citation omitted). " 'To find that the court abused its discretion in failing to order a mistrial for prosecutorial misconduct, we must first be convinced that the prosecution did in fact misconduct itself.' " *Id.* (quoting *United States v. Rivas,* 479 F.3d 259, 266 (3d Cir.2007)).

We agree with Price that the remarks were improper. "The prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Werme,* 939 F.2d 108, 117 (3d Cir.1991) (citation omitted). Here, however, the government was not making reasonable inferences from Patterson's testimony or any other evidence proffered at trial. The only evi-

dence elicited at trial about Patterson and Price's shared background was that they knew each other, that there was violence in the neighborhood where they grew up, and that Patterson still had family in that neighborhood. There was no evidence, nor even an attempt to submit evidence, about the current state of law enforcement in the neighborhood, about a history of retaliation for cooperation with law enforcement, or about a code of silence surrounding criminal activity.[12] The government simply assumed, and in effect asked the jury to assume, that people from housing projects are not to be trusted because they live in fear of retribution and abide by a code that prevents them from disclosing the crimes of their neighbors. Bare assumptions like that have no place at trial. When a party, particularly the government, decides to impeach a witness, including its own witness, it ought to proceed with evidence rather than unsubstantiated innuendo. Inviting the jury to make determinations about Patterson's truthfulness, and, by extension, about Price's guilt, based on practically nothing more than a low-income address exceeded the bounds of permissible advocacy.

■ That said, we do not believe that the District Court abused its discretion in denying Price's motion for a mistrial. While the government's remarks during summation were inappropriate, they did not " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process' in light of the entire proceeding." *United States v. Morena*, 547 F.3d 191, 194 (3d Cir.2008) (quoting *Marshall v. Hendricks*, 307 F.3d 36, 64 (3d Cir.2002)). On the contrary, the evidence of Price's illegal drug dealing was varied and strong, and he points to no other incidents of alleged prosecutorial miscon-

duct that occurred during trial. *See id.* (We must consider the prosecutor's improper actions and the weight of properly admitted evidence in assessing whether prosecutorial misconduct necessitates reversal of a conviction.). Viewing the proceedings as a whole, we cannot say that the District Court erred in determining that Price's conviction was fair, in spite of the improper comment in closing.

## III.  Conclusion

For the foregoing reasons, we will affirm Price's conviction and sentence.

---

12. Whether such evidence could properly have been admitted is not something we have

occasion to consider now.