IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-40363
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JESUS CARBAJAL; FAVIAN RAMOS; ANDRES MILAN,
also known as "Cheque;" JULIAN SOLIZ PEREZ,
also known as "Chico,"

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Eastern District of Texas

_____
April 25, 2002
Before GARWOOD, JOLLY, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The defendants in this case were indicted, along with twenty-eight others, for a conspiracy to distribute cocaine and heroin in the Dallas area. The jury found the defendants guilty of conspiracy and attributed at least one kilogram of heroin and at least five kilograms of cocaine to each defendant. On appeal, the defendants challenge the district court's interpretation of the Sentencing Guidelines and the sufficiency of the evidence against them. We find no error and affirm.

Following a series of heroin overdoses in 1996 and 1997, police in Dallas and its surrounding communities enlisted the assistance of the FBI as part of an investigation of heroin distribution networks in the area. The resulting Collin/Denton Counties Drug Task Force identified several large heroin distributors operating in Dallas, including one led by defendant Jesus "Tony" Carbajal and one led by Rogelio Moreno. As part of this investigation, the task force monitored telephone conversations involving Carbajal, Moreno, and Carbajal's lieutenant, Rogelio "Oscar" Saenz. The recorded calls indicated that both Moreno and Carbajal obtained most of their heroin supplies from Caesar Rodriguez, a distributor from California. Based on information from these calls, police calculated that the Carbajal and Moreno organizations sold more than seventy-five kilograms of heroin between June 1999 and May 2000.

The task force also conducted ground and air surveillance of suspected conspirators, which revealed the procedures by which Carbajal and Moreno resold the drugs to individuals in the Dallas area.[1] Customers would call Carbajal or Moreno to place orders for heroin and/or cocaine. The customers would be directed to meet a runner at one of several standard locations in and around Dallas.

---

[1] In their testimony at trial, Rogelio Saenz and other conspirators confirmed that Carbajal's organization typically followed these procedures.

At the designated meeting place, the runner would instruct the customer to follow him to another location to complete the transaction. Some of these customers lived in Plano, Texas, a community north of Dallas in the Eastern District of Texas, and would return home after purchasing the drugs.

In October 2000, a grand jury sitting in the Eastern District of Texas returned a superseding indictment against thirty-two defendants connected with the Carbajal and Moreno organizations.[2] The indictment alleged that each defendant participated in a conspiracy to distribute at least one kilogram of heroin and at least five kilograms of cocaine in violation of 21 U.S.C. §§ 841 and 846. Twenty-eight of the defendants pleaded guilty, and many of these testified against the four remaining defendants: Carbajal, Andres Milan, Julian Soliz Perez, and Favian Ramos. According to the indictment, each defendant played a distinct role in the overall conspiracy: Carbajal was a leader within the distribution network, Milan was Carbajal's alternate heroin supplier, Perez was an intermediary between the Dallas distributors and their California supplier, and Ramos purchased heroin from the same California supplier.

After a three-day trial in December 2000, a jury found all four defendants guilty of participation in a conspiracy to distribute heroin and cocaine. In response to special issues

---

[2] The original indictment, which did not include the quantity of drugs involved, was filed in May 2000.

submitted by the court, the jury specifically attributed one kilogram of heroin and five kilograms of cocaine to each defendant. The district court sentenced Carbajal to life in prison followed by ten years of supervised release.[3] Milan received a sentence of 140 months in prison followed by five years of supervised release. Perez received a sentence of 170 months in prison followed by five years of supervised release. Ramos received a sentence of 148 months in prison followed by four years of supervised release.

On appeal, each defendant raises various issues concerning the propriety of their sentences and the sufficiency of the evidence against them. We now turn to address those issues.

II

Carbajal's primary argument concerns the district court's application of Sentencing Guideline § 2D1.1(a)(2) to enhance his sentence. Section 2D1.1(a)(2) establishes a base offense level of 38 if the defendant is convicted of drug trafficking under 21 U.S.C. § 841(b) "and the offense of conviction establishes that death or serious bodily injury resulted from use of the substance." Based on its finding "beyond a reasonable doubt" that two overdose deaths resulted from the use of heroin sold by Carbajal's organization, the district court concluded that § 2D1.1(a)(2)

_____

[3] The district court sentenced the defendants based solely on the amount of heroin attributable to them.

4

applied to Carbajal and sentenced Carbajal accordingly.[4]  On appeal, Carbajal challenges the district court's determination on two grounds.  First, Carbajal argues that the district court employed too lenient a standard of causation in determining whether the deaths "resulted from" heroin purchased from Carbajal's organization.  Second, he contends that the government did not present sufficient evidence connecting Carbajal with the deaths to warrant application of § 2D1.1(a)(2).  We review the district court's interpretation of the Sentencing Guidelines de novo and the district court's factual findings for clear error.  See United States v. Paul, 274 F.3d 155, 161 (5th Cir. 2001).

A

Carbajal first argues that the sentence enhancement established in § 2D1.1(a)(2) applies only if the government can show that drugs attributable to him were the proximate, reasonably foreseeable cause of a death.  The government responds, and the district court agreed, that the guidelines impose no such causation requirement.  As a consequence, the district court determined that Carbajal could be held responsible for overdose deaths if the government could show a reasonable medical probability that heroin

_____

[4] The district court also found by a preponderance of the evidence that heroin sold by Carbajal caused the overdose death of a third customer.  In addition, the district court increased Carbajal's base offense level by four points because Carbajal organized and led the drug distribution operation.

5

supplied by Carbajal caused the deaths.[5] For the reasons set out below, we agree and hold that § 2D1.1(a)(2) is a strict liability provision that applies without regard for common law principles of proximate cause or reasonable foreseeability.

It is well established that our interpretation of the Sentencing Guidelines is subject to the ordinary rules of statutory construction. See United States v. Boudreau, 250 F.3d 279, 285 (5th Cir. 2001). If the language of the guideline is unambiguous, our inquiry begins and ends with an analysis of the plain meaning of that language. See id. Although we have not found any cases that specifically decide the standard of causation required by § 2D1.1(a)(2), we are not without guidance on this issue.[6] A number of courts have had occasion to interpret similar language in 21 U.S.C. § 841(b)(1)(C), which prescribes a minimum twenty year prison term "if death or serious bodily injury results from the use of [drugs sold by the defendant]." These courts have uniformly held that § 841(b)(1)(C) applies "without regard for common law proximate cause concepts."[7] Relying on the plain language of the

_____

[5] Perez, Milan, and Ramos were not sentenced under § 2D1.1(a)(2).

[6] In United States v. McIntosh, 236 F.3d 968, 971 n.4 (8th Cir. 2001), the Eighth Circuit declined to reach the defendant's argument that § 2D1.1(a)(2) applies only if the death is "reasonably foreseeable." However, the court noted in dicta that it "fail[ed] to see how [§ 2D1.1(a)(2)] could be interpreted differently than [§ 841(b)(1)(A)]; the language is identical." Id.

[7] See United States v. Robinson, 167 F.3d 824, 831 (3d Cir. 1999) ("It is obvious Congress intended in such a case that the

6

statute, the courts determined that the statute does not explicitly impose a "reasonable foreseeability" requirement and found no reason to create such a requirement. Because the guideline at issue here employs essentially the same language as § 841(b)(1)(C), the government argues that the guideline should be interpreted in accordance with these cases.

Carbajal contends that, rather than adopting the reasoning of the cases interpreting § 841(b)(1)(C), we should interpret the plain language of the guideline provision independently. In Carbajal's view, common law proximate cause and foreseeability principles should apply under § 2D1.1(a)(2) because the plain meaning of the term "resulted from" requires the drugs sold by the defendant "to be a direct cause of death, not a possible or remote cause." Carbajal therefore argues that § 2D1.1(a)(2) effectively

_____

20-year mandatory minimum [under 21 U.S.C. § 841(b)(1)(C)] would apply if death or serious bodily injury resulted from the use of the substance without regard for common law proximate cause concepts."); United States v. Patterson, 38 F.3d 139, 145 (4th Cir. 1994) ("[T]he plain language of § 841(b)(1)(C) does not require, nor does it indicate, that prior to applying the enhanced sentence, the district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event."); United States v. Rebmann, 226 F.3d 521, 525 (6th Cir. 2000) ("On its face, [21 U.S.C. § 841] is, in effect, a strict liability statute with respect to the injury or death of another arising out of the distribution of drugs."); United States v. Soler, 275 F.3d 146, 152-53 (1st Cir. 2002) ("[W]hen a defendant deals drugs and a user of those drugs dies as a result, section 841(b)(1)(C) applies without any independent proof that the death was a reasonably foreseeable event."); see also United States v. McIntosh, 236 F.3d 968, 973 (8th Cir. 2001) ("Congress intended § 841(b)(1)(A)'s enhancement to apply without regard to the principles of proximate cause or the foreseeability of death or serious bodily injury.").

7

subsumes traditional causation principles like foreseeability and proximate causation.

Like § 841(b)(1)(C), however, the plain language of § 2D1.1(a)(2) does not impose any sort of explicit causation requirement. Nor can we find a basis to infer that the term "resulted from" incorporates these principles.[8] The Sentencing Commission could have expressly limited the sentencing enhancement to cases in which the drugs sold by the defendant foreseeably caused a death, but it chose not to do so. We therefore hold, in accordance with our sister circuits' interpretation of § 841(b)(1)(C), that § 2D1.1(a)(2) is a strict liability provision and does not require proof of proximate causation or reasonable foreseeability.[9]

---

[8] We note that a leading dictionary defines "result from" as "to proceed, spring, or arise as a consequence, effect, or conclusion." Webster's Third New Int'l Dictionary 1936 (1993). This definition supports our conclusion that § 2D1.1(a)(2) does not impose a proximate causation or reasonable foreseeability requirement.

[9] Carbajal further argues that the definition of the term "offense of conviction" should inform our interpretation of the standard of causation under § 2D1.1(a)(2). The guidelines do not define the term "offense of conviction," but the Third Circuit has suggested in *dicta* that "offense of conviction" should be interpreted to "include[] only the facts underlying the specific criminal offense for which the defendant was convicted." United States v. Pressler, 256 F.3d 144, 157 n.7 (3d Cir. 2001) (citing the application notes to § 1B1.1). The Third Circuit also observed that, following Apprendi v. New Jersey, 530 U.S. 466 (2000), most courts have interpreted § 841 to create a series of distinct offenses involving a specified quantity of drugs. See id. The court therefore voiced some concern that the "offense of conviction" in a drug conspiracy case -- that is, the facts underlying the elements of the conspiracy offense -- could not

8

In the alternative, Carbajal urges us to adopt the proximate cause test applied by the Sixth Circuit in <u>United States v. Swiney</u>, 203 F.3d 397 (6th Cir.), <u>cert. denied</u>, 120 S.Ct. 2678 (2000). The court in <u>Swiney</u> held that, before the district court may enhance a defendant's sentence under § 841(b)(1)(C) based solely on the conduct of a coconspirator, the court must find that the coconspirator's conduct was (1) in furtherance of the conspiracy and (2) reasonably foreseeable. See <u>id.</u> at 403 (applying U.S.S.G. § 1B1.3(a)(1)(B)). The court in <u>Swiney</u>, however, addressed a situation in which the defendant played no direct role in distributing or manufacturing the drugs that allegedly caused the deaths.[10] In the present case, by contrast, the government presented evidence that Carbajal participated directly in or supervised the sales of heroin that led to three overdose deaths. Because the district court held Carbajal responsible for the three overdose deaths based on his own conduct, the holding in <u>Swiney</u> does not apply.

---

"establish" that death resulted from drugs sold by the defendant. We need not decide this issue, however, because the proposed narrow definition of the term "offense of conviction" does not affect our conclusion that the plain meaning of the term "resulted from" does not include a foreseeability requirement or otherwise limit the scope of § 2D1.1(a)(2) as applied to this case.

[10] See <u>McIntosh</u>, 236 F.3d at 974 ("We find <u>Swiney</u>'s reasoning applicable only in those cases in which a conspiracy defendant played no direct part in manufacturing the drug or in immediately distributing the drug that caused the death or serious bodily injury."); <u>Soler</u>, 275 F.3d at 152 ("When the defendant's own conduct has caused the harm, those cases [like <u>Swiney</u>] are inapposite. Rather, a rule of strict liability applies.").

9

We therefore hold that the district court did not err in declining to apply a proximate cause or reasonable foreseeability test before enhancing Carbajal's sentence under § 2D1.1(a)(2).

B

The next question is whether, applying the above standard of causation to the circumstances present here, the district court clearly erred in attributing the heroin-related deaths to Carbajal. At the sentencing hearing, the government sought to show that, between December 1998 and July 1999, three people died of heroin overdoses in the Dallas area after using heroin purchased from Carbajal.

The government first presented evidence that Carbajal's organization sold heroin to Josh Harmon that resulted in Harmon's death. According to the testimony at the sentencing hearing, Harmon and two friends telephoned Carbajal's organization on December 19, 1998 to place an order for heroin. Later that day, they met with Carbajal's lieutenant, "Oscar" Saenz, and purchased a quantity of heroin.[11] Harmon and his friends then mixed the heroin with an over-the-counter sleeping aid and divided the mixture into capsules. Harmon received about forty of the capsules, some of which he consumed later that night at a party. The next morning, Harmon's friends had difficulty reviving him, and they attempted to resuscitate him. When these efforts failed,

_____

[11] The government also presented testimony that Saenz obtained his heroin solely from Carbajal.

10

Harmon was eventually left outside a hospital in Dallas, where he was pronounced dead.

At the sentencing hearing, the government's medical expert testified that, despite traces of other drugs in Harmon's blood, there was a reasonable medical probability that heroin was the cause of Harmon's death. Although Harmon's friend testified that Harmon could have purchased additional heroin from someone at the party, the friend also testified that heroin users ordinary consume between ten and fifteen capsules over a twelve hour period -- considerably fewer than the forty capsules that Harmon received earlier that day. Taken together, we find this evidence sufficient to support the district court's conclusion that Carbajal, acting through Saenz, sold Harmon the heroin that resulted in his death.[12]

Carbajal further argues that Harmon's death was the product of a superseding cause and therefore did not "result[] from" the heroin he purchased from Carbajal's organization. Specifically, Carbajal argues that Harmon's death was caused by his friends' failure to seek immediate medical attention. Even assuming that the concept of superseding causes applies under § 2D1.1(a)(2), however, this argument fails because negligent (as opposed to grossly negligent or intentional) acts by third parties cannot be

---

[12] Because the district court found that Harmon's death "resulted from" heroin sold by Carbajal beyond a reasonable doubt, we need not address whether the district court could have applied a lower standard of proof in this context.

11

the superseding cause of an injury if they are foreseeable.[13]  In this case, there is no evidence that Harmon's friends engaged in grossly negligent conduct or intended to injure Harmon by failing to take him promptly to the hospital.[14]  Because the failure to seek immediate treatment for a heroin overdose is clearly a foreseeable outcome, any such delay could not break the causal chain between Harmon's death and the sale of heroin by Carbajal.

The government also presented evidence that Mark Tuinei, a former offensive lineman for the Dallas Cowboys, purchased heroin from Saenz that led to Tuinei's death.  Specifically, the district court heard testimony that Tuinei and three others -- Keelan Murray, Wes Malone, and Nicki Sualua -- purchased a quantity of heroin from Saenz at a gas station in Dallas.  After receiving some instruction from Murray, Tuinei "cooked" and injected the heroin

---

[13] See United States v. Rodriquez, 279 F.3d 947, 952 (11th Cir. 2002) ("It is also a basic principle of criminal law that foreseeable negligent acts of a third party do not sever the chain of causation."); 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.12, at 408-09 (1986) (same); see also United States v. Guillette, 547 F.2d 743, 749 (2d Cir. 1976) ("Where such intervening events [as negligent medical treatment] are foreseeable and naturally result from a perpetrator's criminal conduct, the law considers the chain of legal causation unbroken and holds the perpetrator criminally responsible for the resulting harm.").

[14] Cf. Rodriquez, 279 F.3d at 952 (holding that a failure to obtain prompt medical treatment for overdosing heroin user "did not break the chain of legal causation" under 21 U.S.C. § 841(b)(1)(C)); United States v. Purchess, 107 F.3d 1261, 1270-71 (7th Cir. 1997) (rejecting the argument that victim's actions were a superseding cause of his own death because he refused medical treatment).

12

into his arm. Tuinei immediately passed out on a couch. Although Tuinei had stopped breathing, Murray successfully revived him by performing CPR. Because Tuinei remained unconscious, however, Murray and Sualua carried him to his car. Sualua drove Tuinei home and stayed with Tuinei while he slept it off. When Tuinei did not wake up the next morning, Sualua called emergency paramedics, who pronounced Tuinei dead.

At the sentencing hearing, the government's medical expert testified that the cause of Tuinei's death was the mixed effect of heroin and ecstasy and that there was a reasonable medical probability that heroin was "primarily responsible." Here again, the district court did not clearly err in attributing Tuinei's death to heroin purchased from Carbajal's organization. Cf. United States v. Cathey, 259 F.3d 365, 368 (5th Cir. 2001) (affirming an enhanced sentence based on evidence that a death resulted from the combined effect of the heroin provided by the defendant and cocaine).

In sum, we find that the government presented sufficient evidence to support the district court's determination that the overdose deaths of Harmon and Tuinei "resulted from" the heroin they purchased from Carbajal.[15] As a consequence, the district

---

[15] The government also presented evidence that Kyle Walker, a regular heroin user, died after ingesting heroin he obtained from his girlfriend. An officer testified that, before she fled the country, Walker's girlfriend told the officer that she had purchased heroin from Saenz on the day of Walker's death. As noted above, § 2D1.1(a)(2) applies if the government can prove that one

court did not err in applying § 2D1.1(a)(2) and sentencing Carbajal to life imprisonment.[16]

## III

Carbajal next challenges the district court's decision to exclude evidence that allegedly undermines the pre-sentence report's conclusion that the deaths of Harmon, Tuinei, and Walker were attributable to heroin sold by Carbajal. During the sentencing hearing, Carbajal sought to present cross-examination testimony by the government's medical expert that Harmon, Tuinei, and Walker may not have died if they had received prompt medical attention. We review for an abuse of discretion the district court's decision to exclude evidence rebutting information in the

---

death resulted from drugs sold by the defendant. Because the government has satisfied this requirement with respect to Harmon and Tuinei, we need not address the sufficiency of the evidence connecting Carbajal to Walker's death.

[16] Carbajal also contends that the sentencing enhancement based on his prior conviction and the enhancement based on the heroin-related deaths are elements of an aggravated offense that must be submitted to the jury and proven beyond a reasonable doubt under Apprendi v. New Jersey, 530 U.S. 466 (2000). The government argues that Carbajal affirmatively waived these arguments by adopting his co-defendants' pre-trial motion -- which was granted by the district court -- to redact from the indictment and to withhold from the jury any evidence of the three heroin-related deaths. After reviewing the record, however, we find it clear that Carbajal did not join his co-defendants' motion and expressly preserved his arguments under Apprendi. In any event, Carbajal concedes that these arguments are foreclosed by precedent because his sentence fell within the range authorized by the statute of conviction. See Apprendi, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); 21 U.S.C. § 841(b)(1)(A).

14

pre-sentence report. See Fed. R. Crim. P. 32(c)(3)(A) (providing that the defendant may, "in the discretion of the court, introduce testimony . . . relating to any alleged factual inaccuracy contained in [the report]").

As a general rule, information in the pre-sentence report is presumed reliable and may be adopted by the district court "without further inquiry" if the defendant fails to demonstrate by competent rebuttal evidence that the information is "'materially untrue, inaccurate or unreliable.'" United States v. Parker, 133 F.3d 322, 329 (5th Cir. 1998) (citation omitted).

In this case, Carbajal sought to show that the pre-sentence report was inaccurate because it did not consider whether delays in obtaining medical attention may have contributed to the three heroin-related deaths. As we noted earlier, however, the failure to seek prompt medical attention does not constitute a superseding cause of the victims' deaths unless that failure is grossly negligent or intended to injure the victim. See Rodriguez, 279 F.3d at 952; Cathey, 259 F.3d at 368; Purchess, 107 F.3d at 1270-71. The testimony offered by Carbajal, in contrast, merely indicated that Harmon's chance of survival would have "improved" if his friends had taken him to the hospital immediately. Because the testimony did not indicate that the failure to seek prompt medical attention was grossly negligent or unforeseeable, the testimony would not support a finding that the three deaths were the product

15

of a superseding cause.  We therefore conclude that the district court did not abuse its discretion by refusing to consider the testimony in its sentencing determination.

IV

Carbajal next argues that the district court erred by imposing a sentence greater than that authorized for a cocaine-only conspiracy. The superseding indictment in this case alleged a conspiracy to distribute at least one kilogram of heroin *and* at least five kilograms of cocaine.  Although the jury specifically attributed more than one kilogram of heroin and more than five kilograms of cocaine to each defendant, the district court explicitly declined to consider the jury's finding on cocaine in determining their respective sentences.  According to Carbajal, the district court effectively granted a motion for judgment of acquittal with respect to the cocaine component of the conspiracy and thus rendered the jury's verdict on the alleged multi-drug conspiracy "ambiguous."  Carbajal contends that, as a consequence, the district court was required to sentence the defendants within the statutory maximum for the drug carrying the least severe penalty -- in this case, cocaine.[17]

---

[17] As Carbajal concedes, the appellants forfeited this argument by failing to raise it at the sentencing hearing.  See United States v. Olano, 507 U.S. 725, 730-36 (1993).  We therefore have discretion to reverse the district court's ruling only if they can demonstrate plain error.  See id. at 733; Fed. R. Crim. P. 52(b).

16

Carbajal's argument depends upon his assertion that the jury verdict in this case became ambiguous when the district court disregarded the jury's finding on the quantity of cocaine attributable to the conspiracy. A jury verdict in a criminal case is ambiguous if the defendant is charged with a multiple-drug conspiracy and the jury verdict does not specify whether the jury found the defendant guilty with respect to some or all of the drugs. See United States v. Cooper, 966 F.2d 936, 940 (5th Cir. 1992). In this situation, the sentencing court "is limited to imposing a sentence that does not exceed the maximum penalty under the statute providing the least severe punishment."[18]

The defendants in the present case, however, cannot benefit from this rule because the jury verdict was not ambiguous. To the contrary, the jury specifically found that (1) each defendant participated in a conspiracy to distribute heroin and cocaine (2) at least one kilogram of heroin and at least five kilograms of cocaine were attributable to each defendant. The jury's verdict leaves no doubt that it found a conspiracy with respect to *both* cocaine *and* heroin. Although the district court may have implicitly concluded that the jury's findings on the amount of cocaine attributable to the conspiracy were not supported by the

---

[18] Cooper, 966 F.2d at 940-41; see Edwards v. United States, 523 U.S. 511, 515 (1998) (noting that a sentence imposed based on a multiple-object conspiracy after an ambiguous general jury verdict cannot exceed the statutory maximum for a conspiracy involving only one drug).

17

evidence, such a conclusion does not render ambiguous the jury's findings on the amount of heroin attributable to the conspiracy. Thus, the district court properly sentenced the defendants based on the jury's finding that the conspiracy involved at least one kilogram of heroin.

V

Carbajal also contends that the government presented insufficient evidence to prove that venue in the Eastern District of Texas was proper. Carbajal did not, however, raise a proper objection to venue before the jury's verdict and therefore waived this issue on appeal.[19] See United States v. Carreon-Palacio, 267 F.3d 381, 390-91 (5th Cir. 2001). Even assuming that Carbajal did preserve this issue for appeal, venue in the Eastern District was proper because the government presented evidence that a convicted coconspirator purchased heroin from Carbajal and resold it in Denton County, which is located in the Eastern District of Texas.

_____

[19] Carbajal responds that his motion for judgment of acquittal at the close of the government's case was sufficient to raise an issue concerning venue. Carbajal's motion for acquittal argued that "the Government has not presented sufficient evidence that would allow a rational trier of fact to find [Carbajal] guilty beyond a reasonable doubt of what has been charged against him." This motion, standing alone, is not adequate to put the government or the district court on notice that Carbajal challenged venue in the Eastern District of Texas. Although "[w]aivers of venue rights by silence are not to be readily inferred" and a pre-trial objection to venue is not required in all circumstances, Carbajal failed to preserve this issue for appeal by specifically raising the issue in his motion for acquittal or by requesting a jury instruction on venue. Carreon-Palacio, 267 F.3d at 391-92 (citation and internal quotation marks omitted).

18

See United States v. Pomranz, 43 F.3d 156, 158 (5th Cir. 1995) (holding that venue is proper in any district where any act in furtherance of the conspiracy took place).

VI

Milan, Perez, and Ramos each argue that the government presented insufficient evidence to prove beyond a reasonable doubt that they participated in a conspiracy to distribute cocaine and heroin. Where the defendant has preserved his challenge to the sufficiency of the government's evidence, we review de novo the district court's denial of a motion for judgment of acquittal. See United States v. Sanchez, 961 F.2d 1169, 1180 (5th Cir. 1992). Viewing the evidence in the light most favorable to the government, we must determine whether any rational jury could conclude from the evidence presented at trial that the government had proven all of the elements of the offense beyond a reasonable doubt. See United States v. Myers, 104 F.3d 76, 78 (5th Cir. 1997).

To show the existence of a drug conspiracy in violation of 21 U.S.C. § 846, the government must prove: "1) an agreement existed to violate drug laws; 2) the appellants knew of the agreement; and 3) the appellants voluntarily participated in it." United States v. Baptiste, 264 F.3d 578, 587 (5th Cir. 2001) (citation omitted). In this case, Milan, Perez, and Ramos contest the sufficiency of the government's evidence connecting them to the alleged drug distribution conspiracy.

19

Perez argues that the evidence does not support the government's contention that he knowingly participated in the alleged conspiracy. We disagree. Rogelio Moreno, the leader of one of the heroin distribution operations involved in the conspiracy, testified at trial that he obtained cocaine from Perez on two separate occasions. Moreno further testified that (1) Perez had unsuccessfully attempted to obtain heroin for Moreno and (2) Moreno purchased heroin from Caesar Rodriguez in Perez's apartment. This evidence is sufficient to support the jury's conclusion that Perez was a knowing participant in the conspiracy.[20]

Milan argues that the government's evidence connecting him to the conspiracy is inconclusive or, at most, discloses a single drug transaction. To support its theory that Milan was Carbajal's back-up heroin supplier, the government presented evidence that Carbajal

---

[20] Perez also argues that the district court abused its discretion by denying his motion to sever his trial from that of the other defendants. Specifically, he contends that the joint trial with Carbajal created an unacceptable risk that the jury would find him guilty by association. To show that the district court abused its discretion in denying his motion to sever, Perez must demonstrate prejudice from a joint trial (1) "to such an extent that the district court could not provide adequate protection" and (2) that outweighed the government's interest in judicial economy. United States v. Richards, 204 F.3d 177, 193 (5th Cir. 2000). Perez has not demonstrated "clear, specific and compelling prejudice that resulted in an unfair trial," United States v. Bullock, 71 F.3d 171, 174 (5th Cir. 1995), because (1) the conspiracy alleged by the government was not complex, (2) the trial involved only four defendants, and (3) the district court instructed the jury to consider each defendant separately. Cf. Richards, 204 F.3d at 193-94 (holding that a joint conspiracy trial was proper based on the lack of complexity of the conspiracy, the number of defendants, and an appropriate jury instruction).

20

turned to Milan for heroin supplies when Carbajal began to run low. This evidence, viewed in conjunction with evidence of Milan's actual sale of heroin to Carbajal, provides a sufficient basis from which the jury could reasonably infer that Milan knowingly participated in the conspiracy.[21] See United States v. Gourley, 168 F.3d 165, 169 (5th Cir. 1999); cf. United States v. Wilson, 116 F.3d 1066, 1076 (5th Cir. 1997) ("Parties who knowingly participate with core conspirators to achieve a common goal may be members of a single conspiracy."), vacated in part on other grounds by United States v. Brown, 161 F.3d 256 (5th Cir. 1998) (en banc).

Ramos similarly argues that the evidence shows, at most, that he was a "knowing spectator at the scene of [a] crime." Because Ramos failed to preserve this issue for appeal, however, our "review is limited to determining whether there was a manifest miscarriage of justice, that is, whether the record is devoid of evidence pointing to guilt."[22] At trial, the government presented

---

[21] Milan also argues that the jury's finding that he was responsible for at least one kilogram of heroin and at least five kilograms of cocaine is not supported by the evidence. As Milan acknowledges, however, the district court did not consider the jury's cocaine finding in sentencing him. He further argues that Apprendi v. New Jersey, 530 U.S. 466 (2000), requires a new trial because the jury did not have sufficient guidance concerning how to determine the quantity of each drug attributable to each defendant. The rule in Apprendi does not apply here, however, because Milan's 140-month sentence did not exceed the maximum sentence for distribution of an unspecified amount of heroin under 21 U.S.C. § 841(b)(1)(C). See Apprendi, 530 U.S. at 490.

[22] United States v. Delgado, 256 F.3d 264, 274 (5th Cir. 2001)(internal quotation marks and citations omitted). Unlike his co-defendants, Ramos presented evidence in his defense and was

21

evidence that, in the course of searching Ramos's car after he was arrested, police officers found a package containing 140 grams of cocaine and 126 grams of heroin on the floorboard where Ramos was sitting. The record also supports a reasonable inference that Ramos obtained the package from Caesar Rodriguez, the primary supplier for the Carbajal and Moreno organizations, shortly before Ramos was arrested.  In sum, the record is not devoid of evidence connecting Ramos with the conspiracy alleged in the indictment.[23]

### VII

Taking a slightly different tack, Milan argues that the government's evidence at trial proved, at most, the existence of multiple conspiracies rather than the single conspiracy alleged in the indictment.  Because the government could not show that Milan participated in all of the distinct conspiracies, Milan argues that this variance prejudiced him by exposing the jury to evidence of other conspiracies with which he was not connected.

To prevail on this claim, Milan must show (1) an actual variance between the allegations in the indictment and the proof at trial and (2) prejudice flowing from the variance that affected his substantial rights.  See United States v. Morris, 46 F.3d 410, 414

therefore required to renew the motion for acquittal after he rested his case.  Because he failed to do so, Ramos forfeited his objection to the sufficiency of the evidence.  See id.

[23] We need not decide whether the government's evidence would have been sufficient to sustain Ramos's conviction if he had renewed his motion for acquittal at the close of all the evidence.

(5th Cir. 1995).  We conclude that, even assuming Milan can show a variance, he has not shown prejudice sufficient to warrant reversal.

As a general rule, "'where the indictment alleges a single conspiracy and the evidence establishes each defendant's participation in at least one conspiracy[,] a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance.'"  United States v. Pena-Rodriguez, 110 F.3d 1120, 1128 (5th Cir. 1997) (citations omitted, alteration in original).  To show that the district court abused its discretion by trying him with the other defendants, Milan must demonstrate "'specific and compelling prejudice that resulted in an unfair trial and such prejudice must be of a type against which the trial court was unable to afford protection.'"  Pena-Rodriguez, 110 F.3d at 1128 (citation omitted); see also Fed. R. Crim. P. 14.

In this case, Milan relies on a general allegation that the evidence concerning his co-defendants' activities -- particularly those involving the sale of cocaine -- had a prejudicial "spillover effect" on his case because he did not participate in those activities.  But the conspiracy alleged here was not particularly complex, and the district court instructed the jury to consider the charges against each defendant separately.  Under these circumstances, it seems clear that the jury would have no

23

difficulty making an individualized assessment of the evidence against each defendant. Because Milan has failed to "'isolate events occurring in the course of a joint trial'" that may have impaired his defense and to "'demonstrate that such events caused substantial prejudice,'"[24] we conclude that reversal is not warranted in this case.[25]

VIII

---

[24] United States v. Posada-Rios, 158 F.3d 832, 863 (5th Cir. 1998) (quoting United States v. Ellender, 947 F.2d 748, 755 (5th Cir. 1991)); cf. Pena-Rodriguez, 110 F.3d at 1129 (finding no abuse of discretion in trying defendants jointly in part because "the verdicts against the appellants in this case did not turn on particularly complex evidence that was likely to confuse the jury").

[25] We similarly find no merit in Milan's argument that the district court erred by declining to instruct the jury on the difference between a single conspiracy and multiple conspiracies. A multiple conspiracy instruction is required "where the indictment charges several defendants with one (1) overall conspiracy, but the proof at trial indicates that some of the defendants were *only* involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." United States v. Greer, 939 F.2d 1076, 1088 (5th Cir. 1991) (citations omitted). We review Milan's claim only for plain error because Milan did not request an instruction on multiple conspiracies at trial. See United States v. Castaneda-Cantu, 20 F.3d 1325, 1334 (5th Cir. 1994). Although Perez did request such an instruction, Milan did not adopt Perez's request or independently object to the district court's denial of the request. Based on our review of the record, we conclude that Milan has not demonstrated plain error.

Moreover, although Perez adopted Milan's arguments on appeal, Perez has not identified evidence indicating that he was "only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." Greer, 939 F.2d at 1088. Consequently, Perez cannot show that he was entitled to an instruction on multiple conspiracies.

24

For the reasons set out above, we AFFIRM the judgment of the district court.

AFFIRMED.