**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**No. 01-50670**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**PATRICIA DAVIS PETERS MURIEL; FERNANDO MURIEL, III,**

**Defendants-Appellants.**

---

**Appeal from the United States District Court**
**for the Western District of Texas**
**(A-01-CR-2-2-SS)**

---

August 14, 2002

Before HIGGINBOTHAM, JONES, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Fernando and Patricia Muriel having been convicted for, *inter alia*, wire fraud and money laundering, primarily at issue is whether, on this record, the payment of routine business expenses, as well as a substantial payment to the defrauded entity, constitute "promotion" money laundering. Also at issue are: whether the jury charge should have included a good faith instruction; and whether claimed prosecutorial misconduct at trial mandates reversal. **AFFIRMED.**

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

In 1996, Fernando Muriel founded Full Service Staffing (FSS), a sole proprietorship providing temporary workers to client businesses. After FSS paid the temporary employee, it billed the client that amount, plus a mark-up.

In 1997, Muriel contracted with Phillips Financial Corporation for it to fund FSS' payroll through a factoring agreement. Weekly, FSS provided Phillips a list of the hours and billing rate for its employees who worked for clients; Phillips would advance FSS approximately 90 percent of this amount (holding 10 percent in reserve), less a commission of approximately 5 percent.

Phillips, in turn, would collect from the clients. If they did not pay, FSS was assessed a service charge to ensure its help in collection. And, Phillips had full recourse against FSS for uncollected amounts.

In early 1998, Phillips began experiencing serious problems in collecting from FSS' clients. When Wiggs, Phillips' president, contacted Muriel about these problems, Muriel assured Wiggs he would "get them [employees helping run FSS that Muriel relied upon] back in shape and advise them if we needed to get things back current". Muriel also told Wiggs: he was hiring Patricia Peters (now Muriel's wife); she "was a super bookkeeper" and a "super collector"; and "he was going to get everything straightened out".

In fact, FSS was submitting payroll data to Phillips for several fictitious clients, in addition to doing so for legitimate ones. Accordingly, Phillips paid FSS for work that never occurred and was left to bill entities that did not exist. Between January and July 1998, *approximately 60 percent* of all factored sales by FSS were fraudulent.

Concerning Muriel, employees brought billing irregularities to his attention at least twice; each time, he assured them he would "investigate it and rectify the situation". When Muriel's brother began receiving invoices from Phillips addressed to a fictitious client, Muriel told his brother he needed to use his address "because he had some things to clear up".

Muriel also placed a laminated card on his brother's mail box with the name of a fictitious client and instructed his brother to bring him the Phillips invoices when received. When an FBI agent contacted Muriel's brother, Muriel instructed him not to discuss the invoices.

As for Mrs. Muriel, she prepared and filed the DBA certificates for several of the fictitious clients. The address for one was an office rented in her name. When Phillips' president (Wiggs) talked with her concerning the collection problems, she told him she was on her way to job sites to retrieve time cards from clients that, unknown to Wiggs, did not exist.

3

The Muriels were charged with wire fraud, interstate transportation of fraudulently obtained property, money laundering, and related conspiracy counts. Muriel was convicted on all counts; Mrs. Muriel, all but several substantive counts. Their motions for judgment of acquittal were granted on several of the money laundering counts.

## II.

At issue is whether: a good faith instruction should have been given; the prosecutor's claimed improper questioning and remarks mandate reversal; and payments of routine business expenses and one payment to the defrauded entity constitute "promotion" money laundering.

## A.

The Muriels contend two instructions should have been given concerning their claimed good faith. The first stated: the "good faith of a defendant" is a complete defense to the charges; "good faith" means "a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another"; and an "honest mistake in judgment or an honest error in management does not rise to the level of intent to defraud". The second, entitled "FRAUDULENT INTENT", contained similar language.

1.

Mrs. Muriel concedes she neither requested a good faith instruction nor objected to not giving one. She contends "objections made by one defendant in a multiple defendant trial are generally presumed to have been made by all". She also adopts by reference, pursuant to Federal Rule of Appellate Procedure 28(i), the portion of Muriel's brief addressing this issue.

The Government responds: such adoption is ineffective here, because the inquiry is highly fact specific for each defendant; and Muriel's objection did not preserve this issue for Mrs. Muriel. For the reasons stated *infra*, we need not resolve these points raised by the Government's response. In any event, the applicable standard of review is plain error; and the claim fails even if we allow Mrs. Muriel to adopt that portion of Muriel's brief.

2.

Usually, we review for abuse of discretion the district court's refusal of Muriel's proposed good faith instructions. *See, e.g., United States v. Storm*, 36 F.3d 1289, 1294 (5th Cir. 1994), *cert. denied*, 514 U.S. 1084 (1995). That standard, however, is not applicable in this instance. The Muriels' contention on appeal is that the good faith instructions were necessary *because the charge included a deliberate ignorance instruction*. Muriel states in his reply brief: "The government's brief never joins issue with Mr. Muriel's *main point*: the 'deliberate ignorance' instruction

distinguishes this case from all other cases in this Circuit in which this Court has held the absence of the good faith instruction to be harmless". (Emphasis added.) This contention, however, was not presented in district court.

Accordingly, because this contention is raised for the first time on appeal, we review *only* for plain error. *See **United States v. Threadgill***, 172 F.3d 357, 370 (5th Cir.), *cert. denied*, 528 U.S. 871 (1999). Plain error occurs where there is "clear" or "obvious" error that affects the Muriels' substantial rights (the outcome). *E.g., **United States v. Olano***, 507 U.S. 725, 732-735 (1993); ***United States v. Calverley***, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1196 (1995). Moreover, in our discretion, we will correct plain error only if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings". ***Calverley***, 37 F.3d at 164 (internal quotation marks omitted). (*Even if* the usual standard of review (abuse of discretion) were applicable, and even assuming error, the result would be the same under a harmless error analysis.)

For a refused instruction, error occurs when: it is a substantially correct statement; the charge did not substantially cover the requested instruction's content; and the omission "seriously impair[s] the defendant's ability to present his defense". ***Storm***, 36 F.3d at 1294.

6

The Muriels contend that, in the light of the deliberate ignorance instruction, their good faith instructions were necessary to instruct that, if the failure to investigate the possibility of fraudulent conduct was an "honest mistake in judgment" or an "honest error in management", there would be no basis for guilt. (Internal quotation marks omitted.)

Even assuming these instructions are correct statements, their substance was covered by the charge. In defining "knowingly", the charge stated: "While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was *negligent, careless, or foolish*, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact". (Emphasis added.) This instruction allowed the jury to acquit if the Muriels negligently, carelessly, or foolishly chose not to investigate, so long as it was not a *deliberate* attempt to blind themselves to the existence of fraud within FSS. It goes without saying that deliberate ignorance of fraud is inconsistent with any claimed good faith on their part.

Next, according to the Muriels, the absence of the requested instructions substantially impaired their defense because it allowed the Government "to capitalize on the deliberate ignorance instruction", even if Muriel "believed *in good faith* that [FSS] was not engaged in fraud". (Emphasis added.) As discussed, *deliberate* ignorance of fraudulent conduct is at odds with a contention of

7

subjective good faith. The existence of one necessarily negates the existence of the other. Therefore, refusing the instructions did not prevent the Muriels from attempting to persuade the jury that they did believe, in good faith, that no fraudulent conduct was occurring. *See **United States v. Giraldi***, 86 F.3d 1368, 1376 (5th Cir. 1996) ("a district court may refuse to submit an instruction regarding good faith if ... the defendant has had the opportunity to argue good faith to the jury").

In short, there was no error. Even assuming error in refusing the instructions, for the reasons stated above, the error is certainly not "clear" or "obvious". Moreover, given the evidence against the Muriels, they have not shown the refusal affected their substantial rights. Restated, the instructions would not have changed the trial's outcome.

### B.

Muriel next claims three instances of prosecutorial misconduct. Under the regular standard of review, a prosecutor's improper comments warrant reversal only if they affect a defendant's substantial rights. ***United States v. Lowenberg***, 853 F.2d 295, 302 (5th Cir. 1988), *cert. denied*, 489 U.S. 1032 (1989). We consider: "(1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt". ***Id***.

Muriel concedes no objection was made.  Therefore, again we review only for plain error.

The first claim concerns the cross-examination of Muriel.  The prosecutor asked him whether witnesses whose testimony conflicted with his were lying.

Muriel cites *United States v. Thomas*, 246 F.3d 438, 439 n.1 (5th Cir. 2001), which stated that forcing a defendant to "call a number of prosecution witnesses liars" was "inexcusable"; but held that, in the context of the entire trial, reversal was not warranted.  (Any error may well have been invited; on direct, Muriel's counsel asked him to comment on testimony inconsistent with his.  *See United States v. Young*, 470 U.S. 1, 12-13 (1985) ("if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction").)

In his second claim, Muriel points to the prosecutor's statements during closing argument:  "I don't believe what Mr. Muriel told us on the witness stand"; and

> Part of this scheme was to make ... Muriel inaccessible and insulated, and you want to know why that is in my opinion?  I believe he's a coward....
>
> Is that a strong word?  It is, but I can't come up with another one, and I'm not about to start lying to y'all.

*United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1237-38 (5th Cir. 1990), stated a prosecutor's comment that "the defendant

in this case is one of the most artful liars I have ever met" was "improper" and "inexcusable", but held it did not constitute reversible error.  It noted any prejudice was neutralized by the court's cautionary instructions after defendants objected.  Again, however, Muriel did not object, much less request an instruction.

Concerning the prosecutor's stating he believed Muriel is a coward, **United States v. Diecidue**, 603 F.2d 535, 553 (5th Cir. 1979), *cert. denied*, 445 U.S. 946 (1980), *and cert. denied*, 446 U.S. 912 (1980), held that use of the term "coward" in describing defendants who used others to do their "dirty work" was not reversible error because it was not the "type of shorthand characterization of an accused, not based on evidence, [which] is especially likely to stick in the minds of the jury and influence its deliberations".  (Internal quotation marks omitted; alteration in original.)  It also noted that "the characterization of 'coward' does not have the specific legal connotation of a description like 'fugitive' and carries no risk of being misconstrued as a legal conclusion".  *Id*.

Finally, Muriel points to the prosecutor's closing argument statement concerning Muriel's contention he acted foolishly, but not criminally.  The prosecutor recounted to the jury:  he once remarked to a judge for whom he worked that he could not believe that a criminal in a particular case could be "so foolish or stupid"; and the judge responded that, but for foolish criminals,

10

there would be none. The prosecutor told the jury that it is the foolish criminals who are caught and the smart ones who get away. Muriel contends the statement alludes to evidence that was not introduced at trial and was hearsay.

As described above, and for purposes of our plain error review, the prosecutor's challenged conduct was not "clear" or "obvious" error. Even assuming it was, Muriel must show his substantial rights were affected. Accordingly, he contends that, because his conviction "hinged" upon his testimony that he was not aware of the fraud, the questioning and comments struck "at the heart of [his] defense".

The evidence, however, supports not just Muriel's knowledge of the fraudulent scheme, but his personal participation as well. In sum, in the absence of the contested conduct, the trial result would not have been different.

## C.

The Muriels challenge several of the substantive money laundering convictions. They claim insufficient evidence for two office rent payments (Counts 25 and 31) and one for copying costs (Count 26) being intended to promote the fraudulent scheme. Mrs. Muriel makes the same contention for an approximate $32,000 wire transfer to Phillips (Count 30).

The Muriels moved for judgment of acquittal at the close of the Government's case and at the close of all the evidence. Those

11

motions were denied by written opinion.  (Although Mrs. Muriel moved for judgment of acquittal on all counts in both her oral and written motions, she did not specifically challenge the evidence concerning Count 30 ($32,000 wire transfer), even though she did so for several other money laundering counts.  We need not determine whether she adequately preserved the claimed error for that count — her contention fails even under the traditional sufficiency-of-the-evidence standard of review.)

The denial of an acquittal motion is reviewed *de novo*.  **United States v. Carbajal**, 290 F.3d 277, 289 (5th Cir. 2002).  "Viewing the evidence in the light most favorable to the government, we must determine whether any rational jury could conclude from the evidence presented at trial that the government had proven all of the elements of the offense beyond a reasonable doubt."  **Id**.  All "reasonable inferences from the evidence must be construed in favor of the jury verdict".  **United States v. Runyan**, 290 F.3d 223, 238 (5th Cir. 2002) (internal quotation marks and citation omitted).

Pursuant to 18 U.S.C. § 1956(a)(1)(A)(i), the Muriels were convicted of "promotion" money laundering.  That statute criminalizes conduct where the defendant,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity[.]

12

18 U.S.C. § 1956(a)(1)(A)(i).

The Government must prove the defendant: (1) "conducted or attempted to conduct a financial transaction"; (2) "which the defendant knew involved the proceeds of illegal activity"; (3) "with the intent to promote or further unlawful activity". *United States v. Cavalier*, 17 F.3d 90, 92 (5th Cir. 1994). The Muriels contest only the last element; they claim insufficient evidence for the payments being made with intent to promote the fraudulent scheme.

Concerning this last element, there must be "some evidence that a dirty money transaction *that in fact promoted specified unlawful activity* was conducted with the *intent to promote* such activity". *United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999) (first emphasis added). Although the Government is not required to offer direct proof of the Muriels' intending these payments to promote the scheme, the payments must nevertheless constitute "proof of a type of transaction ... that, on its face, indicates an intent to promote such activity". *Id*. at 670-71.

1.

In resolving whether the rent and copying expense payments are such transactions, we must determine whether this conduct is more akin to that in *Brown*, which held the payment of such expenses did not constitute promotion, or to that in *United States v. Peterson*,

13

244 F.3d 385 (5th Cir.), *cert. denied*, 122 S. Ct. 133 (2001), *and cert. denied*, 122 S. Ct. 142 (2001), which held such payments did.

In **Brown**, defendants engaged in several side schemes to defraud customers of a legitimate car dealership. For example, one scheme involved overcharging for document and license/title fees. In holding that payments for routine business expenses such as office and photocopier supplies were not made with the intent to promote these fraudulent schemes, we noted that the "nexus between the charged expenditures and any fraud activity is non-existent or weak". **Brown**, 186 F.3d at 669.

In **Peterson**, defendants challenged their promotion money laundering convictions for the payment of, *inter alia*, "office and administrative expenses". 244 F.3d at 390. Yet, in **Peterson**, the fraudulent scheme accounted for all but a minute portion of the enterprise's revenues. The entity solicited fees from landowners to advertise the sale of their land. For such advertisements, the entity spent only three percent of the revenue received.

**Peterson** held: when "the business as a whole is illegitimate, even individual expenditures that are not intrinsically unlawful can support a promotion money laundering charge". **Id.** at 392. Accordingly, **Peterson** distinguished **Brown** on the basis that, in **Brown**, "[t]he expenditures in question, for the basic operations of the dealership, only indirectly supported the fraudulent operations". **Id**. at 391. In contrast, in **Peterson**, "the fraud was

14

not restricted to isolated instances — the evidence ... supports a conclusion that essentially all of the property owners who paid ... were treated to the same fraudulent misrepresentations". *Id*.

Unlike **Brown** and **Peterson**, we are not faced with an entity that is nearly either 100 percent legitimate or 100 percent fraudulent. Instead, during the period these expenses were paid with the fraudulently received funds, the Muriels acknowledge that "the government's own analysis shows that [FSS'] illegitimate business accounted for approximately 60% of total sales". Needless to say, a business that is 60 percent fraudulent is far removed from the situation in **Brown**, where the schemes were ancillary to an otherwise legitimate business.

Under these facts, the payments of the contested expenses are the types of transactions that can support a promotion money laundering conviction. To continue defrauding Phillips *to the extent that it did*, FSS had to maintain office space to continue to appear legitimate. Items such as copying expenses were necessary to maintain this illusion.

We acknowledge "the importance of not turning the money laundering statute into a money spending statute", **Brown**, 186 F.3d at 670 (internal quotation marks omitted); this is *not* such a case. Instead, the routine business expenses of a 60 percent fraudulent entity do more than "indirectly" support the fraudulent scheme — they are at its heart. Therefore, a reasonable juror could find

15

beyond a reasonable doubt that these payments are of the type intended to promote the scheme.

2.

For FSS' approximate $32,000 payment to Phillips in April 1998, Mrs. Muriel maintains that, because FSS owed money to Phillips for client businesses' delinquencies, the payment was not made with the intent to promote the fraudulent scheme. Unlike the above-discussed payments, this transaction did not involve the payment of a routine business expense. Instead, it was a payment *to the defrauded entity*.

Even assuming there is no direct proof this payment was intended to promote the scheme, it is certainly the type of transaction that, by its nature, evinces such intent. Without question, the payment *directly* perpetuated the fraud. A reasonable juror could infer that this payment was designed to placate Phillips' growing frustration and induce it to continue to pay into the fraudulent scheme. Therefore, because we must draw all reasonable inferences in favor of the verdict, this claim fails.

III.

For the foregoing reasons, the judgments are

***AFFIRMED***.

16