McKEE, Circuit Judge (concurring in part and dissenting in part).
I agree with all of the Majority’s analyses except my colleagues’ conclusion that the evidence was sufficient to prove the conspiracy charged in Count One beyond a reasonable doubt, and the related holdings. As I explain below, I do not think the government proved the agreement required to convict for that conspiracy. Sampson did not raise this argument in the District Court, and my colleagues therefore correctly note that we review only for plain error. See Maj. Opn. at 175. However, I would reverse the conviction on Count One because the failure to prove an essential element of that conspiracy constitutes plain error under Fed. R.Crim.P. 52(b). United States v. Wolfe, 245 F.3d 257, 261 (3d Cir.2001).[12]
*178 I.
As my colleagues explain, in reviewing the sufficiency of the evidence, we must view the evidence introduced at trial in the light most favorable to the government and affirm the conviction if the evidence, so viewed, is sufficient to establish a conspiracy beyond a reasonable doubt.
Viewing the evidence in that light, the government established that Sampson and Salehi had known each other for a long time, and their families had also known each other for a long time. In early 2001, Salehi asked Khan if he (Khan) had sold heroin to Sampson, and Khan admitted that he had. Khan then took a week-long vacation to California. While he was gone, Salehi agreed to sell 250-grams of heroin to Sampson on his own.
Khan testified that when he returned from California, around January 2001, he learned that Salehi had sold the heroin to Sampson and that he had sold it on credit. Salehi had also obtained that heroin from Azzizi on credit. Sampson had not yet paid Salehi because Sampson’s buyer had been arrested before he could pay Sampson. Accordingly, Sampson was indebted to Salehi, and Salehi was indebted to Azzizi, because Salehi was going to pay Azzizi with the money Salehi was to receive from Sampson.
In February 2001, Salehi and Azzizi went to Sampson’s store in an attempt to collect the debt from Sampson. There, they met with Sampson and another person Sampson claimed to have given the heroin to, and they argued about the debt. Afterwards, with the assistance of Khan, the parties decided to negotiate. Sampson, Khan and Salehi met at the store, and Sampson and Salehi negotiated a settlement in Khan’s presence. Sampson agreed to pay Salehi $3,000 and to return a portion of the heroin he had received. However, Sampson apparently never intended to give Salehi the $3,000. Concomitantly, Salehi apparently never intended to be satisfied with only $3,000. Rather, Khan explained at trial that Salehi and Sampson were both “just playing each other.”
Ultimately, according to Khan, Sampson gave Salehi approximately 100 grams of heroin, however, Sampson did not give Salehi any money. Thereafter, Salehi telephoned Sampson several times, in Khan’s presence, demanding payment. In addition, Khan was in Salehi’s presence on one occasion when Salehi spoke to Azzizi by phone and assured Azzizi that he (Salehi) would pay Azzizi for the heroin Salehi had purchased from Azzizi.
In March 2001, Khan was with Salehi when Salehi met with Azzizi. Khan heard Azzizi asking Salehi to satisfy his debt with him because Azzizi needed the money for a trip to Pakistan. According to Khan, Salehi told Azzizi to go to Pakistan and assured Azzizi that he would send him the money there.
Intercepted telephone calls in March 2001 provided more detail regarding the unresolved debt. For example, in a conversation between Azzizi and Salehi on March 24, 2001, Azzizi complained about having no money and told Salehi that he wanted to sell Salehi’s car. Salehi replied that the car was registered in the name of someone they referred to as “Chowdry” *179 and that they (i.e., Salehi and Azzizi) owed Chowdry money. Azzizi replied that they really did not need the car.[13]
In response to Azzizi’s request for money, Salehi told Azzizi to call Qahir (Sampson) and Azzizi replied, “the hell with Qahir.” Azzizi and Salehi then discussed other matters, including the “rate in Canada.” During that call, Salehi directed Azzizi to collect an amount from another person named “Zahid,” and to keep “40” for himself. Salehi also told Azzizi: “you are my dear friend, I always trust you.”
In an intercepted call on March 30, 2001, Salehi called Azzizi in Pakistan to complain that Sampson still had not paid the debt, which was now three months old. Salehi told Azzizi that “[Sampson] accuses me of ripping you off.” Salehi then put Azzizi on hold while he linked Sampson into the call. The three then began to discuss settling the debt. That discussion involved $2,000 or $3,000, and an unidentified product in the amounts of “130” and “120.” However, Sampson complained that he should be compensated because the product had been “bad.”
Azzizi then questioned Sampson’s intentions and asked why Sampson had been avoiding the debt. Sampson promised to pay Salehi $2,000, and said he understood that Salehi owed the money to Azzizi. Salehi and Sampson then began to argue over whether Sampson still owed Salehi $3,000, as Salehi maintained, or only $2,000, as Sampson maintained.
Salehi told Azzizi that Sampson gave him 130 and that Sampson had retained 120. During its closing argument at trial, the government maintained that “130” and “120” referred to heroin because it adds up to the 250 — grams of heroin that Salehi had given Sampson on credit. Thus, the government’s theory was that Sampson returned 130 grams of heroin to Salehi, but kept 120 grams without paying for it, and that this was part of the settlement for having received “bad” heroin from Salehi.[14]
II.
Even when viewed in the light most favorable to the government, this evidence does not establish a single conspiracy consisting of Azzizi, Salehi and Sampson. Rather, it shows two sales, both on credit. The first was from Azzizi to Salehi, and the second was the resale from Salehi to Sampson. I believe that, under our decision in United States v. Pressler, 256 F.3d 144 (3d Cir.2001), the government failed to prove the underlying agreement required to establish the conspiracy charged in Count One.
In Pressler, Pressler and Shreffler were indicted for conspiracy to distribute heroin. At trial, the government proved that Shreffler “obtained and distributed a large amount of heroin,” primarily from Pedro “Pete” Caban. Id. at 146. Caban also sold to several others, and some of those purchasers resold the drugs they bought from Caban. Shreffler knew that Caban was selling to others, and that many of those purchasers resold the heroin themselves. Shreffler also knew that Pressler was buying heroin from Caban and that Pressler was reselling that heroin to many of the same customers that Shreffler was selling the heroin he purchased from Ca-ban to. Id. at 150. The evidence also *180 showed that Pressler knew his buyers had other sources of heroin, and he knew that that source was frequently Pressler.
Pressler and Shreffler appealed then-convictions for conspiracy arguing, in part, that the evidence showed only a buyer/seller relationship, and that the government had failed to prove the agreement that is the sine qua non of conspiracy. The government argued that the underlying agreement was established because Shreffler’s buyers “were not simple purchasers of drugs from Shreffler; they knew that Shreffler obtained heroin from Pete ... and they knew about one another and about Shreffler’s distribution to other persons.” Id. at 152 (internal quotation marks omitted).
In Pressler, the government relied heavily on United States v. Gibbs, 190 F.3d 188 (3d Cir.1999), in arguing that the evidence was sufficient to prove a conspiracy between Shreffler and Pressler beyond a reasonable doubt. In rejecting the government’s claim, we analyzed Gibbs in depth and explained why the conviction of Shreffler and Pressler was not governed by Gibbs. Accordingly, in order to better understand our decision in Pressler, it is also necessary to take a closer look at Gibbs, as summarized in our discussion in Pressler:
In upholding the conviction in Gibbs, we stressed that Sydnor (the buyer) had been aware that Gibbs (the seller, who was unquestionably a member of a drug conspiracy) sold drugs to people other than himself, and emphasized that Gibbs had known that Sydnor resold drugs that he bought from Gibbs to other people. That Sydnor knew that Gibbs sold drugs to many other people was circumstantial evidence that Sydnor knew that Gibbs was part of a larger distribution ring, and the fact that Gibbs was aware that Sydnor resold the drugs that he got from Gibbs was circumstantial evidence that Sydnor was a part of that ring.
Pressler, 256 F.3d at 152-53 (citatations omitted).
My colleagues stress that the evidence here allowed the jury to conclude that Azzizi sold to Salehi, and that Salehi in turn sold to Sampson and that Sampson knew of Azzizi’s sale to Salehi. The majority places particular reliance on the fact that both sales were on credit, and that both pairs of sellers and buyers knew about the other pair. See Maj. Op. at 162. However, the majority’s analysis largely ignores our caution in Pressler that “the mere fact that a defendant comprehends that a person from whom he or she buys drugs or to whom he or she sells drugs also sells drugs to others is not itself sufficient proof that the defendant and the other person are conspirators.” Pressler, 256 F.3d. at 153.
Thus, although my colleagues acknowledge that the Wharton rule is violated when the government attempts to fashion a conspiratorial agreement from an underlying offense requiring two people (such as an illegal sale and purchase), see Maj. Op. at 171, its analysis does exactly that.[15] As we noted in Pressler, “[ejxcept for those who grow, harvest, or process controlled substances themselves, all users and dealers get their drugs from someone else.” 256 F.3d at 153. We also explained in Pressler: “[t]he fact that several of Shreffler’s buyers knew that Shreffler often got *181 Ms drugs from Caban and that they knew about each other is not enough to establish an agreement among them to distribute heroin.” Id. at 153 (emphasis added). I believe that is all we have here.[16]
The majority’s analysis makes the evidence of an underlying agreement appear stronger than it is because my colleagues place undue weight on the fact that Azzizi’s sale to Salehi, and Salehi’s resale to Sampson were both on credit. That does not help establish an “agreement,” it only states the terms of the two sales. As I shall explain, the other factors the majority relies upon to find sufficient evidence of a conspiracy all flow from, and are the result of, the credit terms of the two sales that are charged as a conspiracy in Count One. Experience teaches that, absent more than appears on this record, a credit sale is not so uMque m the illegal drug trade that it evidences an underlying agreement beyond the sale itself.[17]
“[A] conspiracy requires an agreement to commit some other crime beyond the crime constituted by the agreement itself.” Pressler, 256 F.3d at 151 (citation and internal quotation marks omitted). We also explamed in Pressler that the “ ‘factors’ that tend to show the existence of a conspiracy ... are not direct proof that a conspiracy exists; rather, [they are] circumstantial evidence of the underlying agreement that is itself necessary to sustain a conspiracy charge.” Id. at 149 (citing United States v. Kapp, 781 F.2d 1008, 1010 (3d. Cir.1986)). To better understand that the “factors” the majority relies upon to sustain the conspiracy here are nothing more than evidence of two illegal drug sales, it is also helpful to consider our discussion of United States v. Powell, 113 F.3d 464 (3d. Cir.1997) in Pressler. There, we summarized Powell as follows:
A witness testified that James and Antonio Powell lived together, that they both sold cocame, that they shared plastic bags to package the cocaine, and that if one of the brothers ran out of cocaine to sell, the other brother would supply it.... James Powell assured a police informant that the cocaine the Powell brothers would sell the next day would match in quality the cocaine sold earlier by Antonio Powell. During a recorded telephone conversation, Antonio Powell consulted James Powell before setting the sales price for cocaine, and James Powell also served as a lookout and driver when Antonio Powell sold cocaine to an undercover agent.
Pressler, 256 F.3d at 154-55 (citing Powell, 113 F.3d. at 467). Durmg our discussion in Pressler, we focused on the following factors in explaining why the evidence had established a conspiracy m Powell: 1) James Powell had acted as a lookout for AntoMo when the latter conducted drug sales; 2) the two sometimes consulted each other “before setting a sales price for a given deal;” and 3) they shared packagmg materials and thereby “demonstrated that *182 they had integrated their activities.” Pressler, at 155.
Our discussion in Pressler also compared the Powell factors with the evidence that had been sufficient to prove a conspiracy in Gibbs. First, we noted that, in Gibbs, there was evidence that “Sydnor (the buyer) had offered to provide physical protection for Gibbs (the seller) [this showed] [t]hat Sydnor ... had a greater stake in [the seller’s] safety than a typical buyer, which in turn implied that a cooperative relationship existed between the two of them.” Id. (citing Gibbs, 190 F.3d at 201). Second, “[t]here was evidence that Gibbs had sold Sydnor drugs on credit’ which meant that each had an economic stake in the other’s continued success.” Id. (citing Gibbs, 190 F.3d at 201). This is the one factor that supports the conviction on Count One and the majority focuses on it. However, as I suggested above, and discuss more fully below, without more, the fact that the drugs in Count One were “fronted” does not suggest anything more than the credit terms of the sale. It does not prove a “prior or contemporaneous understanding beyond the sales agreement itself ... [,]” and it “is insufficient to establish that the buyer was a member of the seller’s conspiracy.” Gibbs, 190 F.3d at 197.
In Gibbs, there were numerous transactions involving the “buyer” and “seller,” and numerous coded telephone calls involving them, and others. Significantly, the code involved there was “virtually incomprehensible to the untrained ear.” Gibbs, at 196. It was more significant than a call evidencing little more than a common sense understanding that it is not a good idea to say “heroin” on the telephone when discussing illegal drug sales. Discussions between Sampson, Azzizi and Salehi were not so involved or complicated that a party who knew they were discussing an illegal drug sale could not figure out precisely what they were saying. The “code” here neither requires nor suggests “a considerable degree of coordination and [the] existence of a cooperative relationship.” Pressler, 256 F.3d at 155. Accordingly, the “code” at issue here, is not nearly as probative of a conspiratorial relationship as the “incomprehensible” discussion in Gibbs because this conversation does not suggest a high level of coordination between the participants.
Here, we have a credit sale, and a resale. The Count One conspiracy does not include a long series of transactions, and Azzizi’s stake in Sampson’s debt to Salehi is therefore limited to Sampson’s ability to pay for the drugs Salehi fronted to Sampson. It does not suggest the actors had any interest in the “continued success” of any overarching enterprise. In Gibbs, Gibbs and another conspirator “used and attempted to use acts of violence to further the conspiracy.” 190 F.3d at 195. There is no evidence that these actors had such a mutuality of interest that one was willing to threaten violence to collect the debt of another.
It is also important to note that in Pressler, we noted that knowledge that one is “part of a larger operation,” is more probative of membership in a conspiracy when “it is clear that a drug conspiracy existed,” but such knowledge is “singularly unhelpful where the question is whether the ‘larger operation’ was present at all.” 256 F.3d at 152. Indeed, a contrary view would violate the Wharton rule and give rise to a conspiracy whenever there is a sale of illegal drugs (particularly when there is a resale), because all participants in any such transaction beyond the initial manufacture and distribution of the drug, knows that others have been involved in the sales network.
*183 My colleagues summarize the direct evidence relied upon to sustain the conviction on Count One. First, Azzizi fronted the drugs to Salehi “and knew Salehi had in turn also given Sampson the heroin on credit....” See Maj. Op. at 172. According to the majority, the credit transactions “could have been construed as an established method of payment as contemplated by Gibbs.” Id. Similarly, the majority believes that “the tenor, length, and context of the negotiations between Azzizi, Salehi, and Sampson after Sampson’s buyer was arrested, ... square with Gibbs inquiry into whether [they] ‘put their heads together’ to figure out how to address a common problem or shared interest.” Id., at 172 (citing Gibbs, 190 F.3d at 199). The majority believes that “[t]he jury could infer this because the three addressed not only the issue of money, but also Sampson’s allegation that some of what he had been given was ‘bad.’ ” Id Lastly, as suggested by my discussion of the purported code, the majority claims the nature of the recorded telephone conversations “themselves easily allowed a reasonable jury to infer that Azzizi was a participant with Salehi and Sampson, given the unusual and cryptic nature of those calls.” Id., at 172. My colleagues cite United States v. McGlory, 968 F.2d 309, 324 n. 9 to support this latter conclusion.
I have already explained why the “cryptic” ñatee of the calls here is not as probative of a conspiracy as it might otherwise have been. In addition, I note that the cited portion of McGlory, did not address the sufficiency of the proof of a conspiracy. Rather, the issue discussed in that footnote was whether the jury could have concluded that certain excerpts the government had introduced at trial from recorded conversations involved drugs. Judge Becker wrote a concurring opinion in which he argued that an expert should have been called to tie the conversations to a drug conspiracy. The majority rejected that position explaining: “[i]n the context of all the evidence the jury had before it in this particular case, we think a lay inference that the parties (sic) cryptic statements referred to drugs and drug transactions was permissible.” McGlory, 968 F.2d at 324 n. 9.
The majority stretches reliance on the terms of the sale here even further by suggesting that “the chain of credit-to-credit transfers ..., in combination with the efforts of the three to peaceably negotiate the successful resolution of a subsequent problem, ‘could not have been carried on except as the result of a preconceived scheme or common understanding.’” Maj. Op. at 172-73 (citing Gibbs, 190 F.3d at 197). I frankly don’t understand that conclusion, nor do my colleagues explain it. No underlying agreement beyond the sale and resale in Count One was required to “peaceably negotiate” payment. No “preconceived scheme of common understanding” was required for Azzizi to know that it was in his interest for Sampson to pay Salehi so that Salehi would have money to pay him.
Similarly, the fact that the negotiations were “peaceful” proves nothing. We are all too familiar with examples of members of a criminal enterprise resorting to violence to enforce discipline and maintain the “respect” and fear of confederates to conclude, without more than appears on this record, that peaceful negotiation somehow makes a conspiracy more likely. Moreover, as noted above, in Gibbs, we thought it significant that the “use[ ] and attempted use [of] acts of violence to further the conspiracy” was relevant to the existence of a conspiracy. 190 F.3d at 195. I don’t understand how the peaceful negotiations here would be probative of anything other than efforts to collect the underlying debt absent speculation that *184 peaceful negotiation is somehow probative of an illegal conspiracy. If the use of violence is probative of a conspiratorial relationship as suggested in Gibbs, I fail to see how peaceful negotiation is also probative of an illegal agreement.
The other factors the majority relies upon are also harvested from the single factor of the terms of these two sales and the conclusions the majority attempts to draw from those factors also are more akin to speculation than inference based upon this record.
For example, the fact that “all three conferred in person to discuss collection” of Sampson’s debt does not advance an inquiry into whether there was an agreement beyond the failure to pay the respective sellers. If the “in person” meeting is relevant to an agreement separate from Sampson’s agreement to pay Salehi and Salehi’s agreement to pay Azzizi, then the subsequent phone conversations were not all that relevant to the existence of a conspiracy. The converse '.*3 also true. If the subsequent phone conversations are relevant to an underlying agreement, then I fail to see how a meeting “in person to discuss collection,” advances our inquiry. There is nothing here to suggest that co-conspirators are more likely to meet in person to discuss a debt owed among themselves than persons who have agreed to do nothing more than buy and sell illegal drugs. That is particularly true where, as here, the actors and their families have known each other for a long time.
The majority also thinks it significant that Azzizi not only gave Salehi the 250-grams of heroin on credit, but that Salehi “had in turn also given Sampson the heroin on credit ...” Maj. Op. at 173. Once again, that shows nothing other than a credit sale. It only establishes that payment wasn’t expected when the drugs were delivered. Moreover, that factor is somewhat misleading because the record does not establish that Azzizi knew that Salehi would resell to Sampson, let alone that the drugs would be sold on credit.[18] The evidence only established that Sampson’s resale was on credit, not that Salehi or Azzizi approved that method of sale in advance, or even had advance knowledge that credit would be extended to the buyer.[19] Furthermore, at the risk of redundancy, it bears repeating that, even if we assume arguendo that any or all defendants had such advance knowledge, it would still establish nothing more than that the terms of the sales without more than we have here.
Similarly, I am not convinced of the significance of the “tenor, length, and context of the negotiations between Azzizi, Salehi, and Sampson after Sampson’s buyer was arrested” or that they “ ‘put their heads together’ to figure out how to address a common problem or shared interest,” as discussed in Gibbs and Pressler. Maj. Op. at 172. That evidence shows that *185 they “put their heads together” so that each could be paid for their own respective sale insofar as the charges in Count One are concerned. It does not suggest a broader agreement.
Thus, I am also not convinced that a reasonable inference can arise from the fact of Sampson’s allegation that “some of what he had been given was ‘bad.’ ” See Maj. Op. at 172. Sampson was simply telling his seller that he (Sampson, the buyer) was not going to pay for defective merchandise. The entire discussion of “bad stuff’ goes only to the quality of the drugs that were sold and a concern that payment would not be received if those drugs were “bad.” In fact, the jury could just as readily conclude that the actors’ willingness to rest payment upon Sampson’s ability to collect from a single purchaser suggested the absence of a broader conspiracy. Participants in a broader conspiracy would have proceeds from other drug sales that would have allowed Sampson and Salehi to satisfy their respective debts from funds other than the expected payment from the distribution of this 250-grams of heroin. I realize the jury was not required to take that view of the evidence, and that we must view the evidence in the light most favorable to the government, but there must be something more than speculation to make the former scenario more likely than the latter. I can’t find anything more on this record given our discussion of the relevant factors in Pressler.
In the final analysis, my colleagues appear to attach so much weight to the credit nature terms because they believe that, under Gibbs, “a credit relationship may well reflect a demonstrated level of trust.” Maj. Op. at 171. However, as I have already explained, nothing in Gibbs brushes aside the Wharton rule and suggests that a credit transaction can, by itself, transform a sale and purchase into a conspiracy. The “trust” that the majority finds important to an agreement is present in any illegal drug sale. Given the substantial criminal penalties for illegal drug sales and the violence that surrounds them, a drug dealer is not likely to sell to someone he does not trust, and that is true whether the drugs are fronted, or the buyer pays cash. Similarly, absent the kind of desperation that may result from the onset of withdrawal symptoms, common sense suggests that a buyer will not purchase from a seller he does not trust.
I realize that we did say in Gibbs that “[a] credit relationship may well reflect the kind of trust [constituting circumstantial evidence of a conspiracy], and often evidences the parties’ mutual stake in each other’s transactions.” 190 F.3d at 200. However, there, it was undisputed that a drug conspiracy existed. The dispositive issue was whether the defendant had joined that pre-existing conspiracy. Here, the issue is whether a conspiracy even existed. We noted in Pressler, that where the existence of a conspiracy is at issue, much of the Gibbs’ analysis “is simply in-apposite.” 256 F.3d at 146. The conspiracy is at issue here. Therefore, more is needed to transform a sale into a conspiracy than “mutual trust” between buyers and sellers. Mutual trust is a product of the illegal nature of drug sales and the attendant violence and risk. It is not, without more than appears on this record, a product of the existence of a conspiratorial relationship.
III.
To summarize, “[A]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.” Iannelli v. *186 United States, 420 U.S. 770, 774 n. 5, 95 S.Ct. 1284, 43 L.Ed.2d 616 (citation and internal quotations omitted). That is why a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish the existence of a conspiracy. United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir.1986).
“To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal.” United States v. Gibbs, 190 F.3d 188, 197 (3d Cir.1999) (citation omitted). As we noted in United States v. Pressler, 256 F.3d 144, 146 (3d Cir.2001), “[t]he final factor — an agreement between the defendant and some other person — is the essence of the offense, and there is no lesser standard for proving an agreement in drug cases. ” (emphasis added).
Here, the evidence only demonstrated the existence of a buyer-seller relationship between Azzizi and Salehi, on the one hand, and Salehi and Sampson, on the other. Azzizi sold the heroin to Salehi on credit. Then, Salehi sold the heroin to Sampson on credit. At best, the evidence only showed that at some point after Azzizi sold the heroin to Salehi, Azzizi became aware that Sampson bought the heroin from Salehi
Accordingly, I think we must vacate the convictions for the conspiracy charged in Count One, and I must therefore respectfully dissent from the applicable analysis of my colleagues.

. As my colleagues note, these three defendants raise a total of nearly 20 claims of *178 reversible error. However, because I only disagree with the majority’s analysis of the challenge to the convictions in Count One, I need not discuss the remaining claims. The Bruton challenge pertains to a statement that was used to prove the charges in that Count, and the evidence was clearly sufficient to prove the distributions and other conspiracy charged in the indictment. Accordingly, I will limit my discussion to the Count One conspiracy.

. The government argues that Azzizi and Salehi referred to themselves as "we,” and that is additional proof of a conspiratorial agreement. Given the totality of circumstances here, I don't agree.

. Toll records indicated that Azzizi telephoned Salehi’s home 37 times in February 2001, and that Azzizi placed at least one call to Sampson’s store on March 2, 2001, lasting four minutes.

. Wharton’s rule provides: "An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.” United States v. Phillips, 959 F.2d 1187, 1190 (3d. Cir.1992) (citing, 1 Anderson, Wharton’s Criminal Law and Procedure § 89, 191 (1957)).

. In its brief here, the government attempts to distinguish Pressler by arguing that that case "involved two independent drug dealers who often had the same source of supply.” Appellee’s Br. at 29. That is true, but that is not a distinction. Rather, it is the result of our conclusion that the government failed to establish a conspiratorial agreement between Shreffler and Pressler.

. In the myriad number of drug cases that come before the appellate courts, it is not at all uncommon to see evidence that drugs were “fronted;" meaning only that the buyer was sold drugs on credit. As the court explained in discussing just one such situation in United States. v. Witek, 61 F.3d 819, 820 (11th Cir.1995), ”[s]ales were at the going market price and often involved 'fronting'— allowing the customer to pay for the drugs after delivery.”

. I see nothing on this record to support a conclusion that Azzizi even knew that Salehi would resell the drugs when Salehi received them from Azzizi. It is possible that the size of the transaction (250-grams) would suggest further distribution, but the government never tried to use the quantity of the sale to suggest to the jury that Azzizi knew there would be a resale. However, absent expert testimony to that effect, the jury would have had to speculate to reach that conclusion. Moreover, all of this assumes that that knowledge by Azzizi would support the finding of a conspiratorial agreement beyond a reasonable doubt. As set forth above, Pressler does not allow that conclusion on this record.

. Even when the evidence is viewed in the light most favorable to the government, it still does not suggest that either Azzizi or Salehi would care what happened after they sold the drugs as long as they got paid.